750 A.2d 57

VILLAGE OF RIDGEFIELD PARK, PLAINTIFF–APPELLANT, v. NEW YORK, SUSQUEHANNA & WESTERN RAILWAY CORPORATION, A CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT–RESPONDENT.

Argued January 4, 2000—Decided April 5, 2000.

448

*Martin T. Durkin* and *Lewis P. Goldshore* argued the cause for appellant (*Durkin & Boggia* and *Goldshore & Wolf,* attorneys).

*J.S. Lee Cohen,* argued the cause for respondent (*DeCotiis, Fitzpatrick & Gluck,* attorneys; *Kevin M. Kinsella,* on the brief).

*Thomas W. Dunn,* submitted a letter in lieu of brief on behalf of *amici curiae,* New Jersey State League of Municipalities and New Jersey Institute of Municipal Attorneys (*William John Kearns, Jr.,* General Counsel, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal requires the Court to decide the extent to which the Interstate Commerce Commission Termination Act of 1995 (ICC-TA), 49 *U.S.C.A.* §§ 701 to 727 and §§ 10101 to 16106, preempts the state regulation of railroads. Plaintiff Village of Ridgefield Park (Village) alleges that Defendant New York, Susquehanna and Western Railway Corporation (Railroad) is maintaining a nuisance at its facility in the Village. The Village seeks to enjoin that nuisance and to regulate the Railroad facility pursuant to generally applicable health, safety, zoning, and land use laws. The Appellate Division held that the ICCTA preemption of state economic regulation of railroads includes state regulations with any economic impact on the Railroad, including state health, safety, zoning, and land use laws. 318 *N.J.Super.* 385, 724 *A.2d* 267 (App.Div.1999). Although the Appellate Division acknowl-edged that a regulatory "no-man's land" would be intolerable, it held that the Village must first seek relief from the Surface Transportation Board (STB), the federal agency charged with

regulating the economic aspects of railroading. *Id.* at 404, 724 A.2d 267.

Subsequent to the filing of the Appellate Division's opinion, the STB addressed the preemptive effect of the ICCTA and concluded that local municipalities were permitted to exercise more extensive regulatory authority over railroads than was contemplated by the Appellate Division's disposition. In view of the STB's interpretation of the ICCTA, we modify the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings in conformance with this opinion.

I

In 1992 the Railroad began construction on a train maintenance facility in the Village. Previously, the Railroad operated another maintenance facility, "the Little Ferry Yard," in the nearby Borough of Ridgefield, moving its present site after selling the Borough facility to another railroad. The Railroad and its predecessors have maintained a right-of-way through the Village for over a century. The present facility is located in a light-industrial area that is near a residential area and a park. The facility is used primarily to refuel locomotives, add oil to crankcases, water to radiators, and sand to on-board reservoirs for traction in wet rail conditions. At the facility, there are up to thirteen diesel locomotives idling for hours at a time. The facility has elicited complaints from Village officials and residents about noise, fumes, soot, and ground vibrations.

The Railroad began construction at the Village site without applying for zoning or construction permits or otherwise informing the Village of its plans. The Village contacted the Railroad in May 1992 to request information about the ongoing construction at the site and to inform the Railroad that it was required to apply for permits. On June 1, 1992, Robert A. Kurdock, Vice President of the Railroad, responded, stating that the newly installed side-track would be used as "a location to perform Federal Railroad Administration required services and inspections on our locomo-

tives." Kurdock assured the Village that if the railroad decided "to build any more" it would inform the Village and apply for any required permits.

In June and July 1992, the Railroad and Village officials discussed the Railroad's plans to build an engine house at the site to minimize noise and air pollution, and the Railroad delivered a rendering of the proposed engine house. In a July 24, 1992 letter, counsel for the Railroad described the Railroad's plans to build the engine house at the maintenance facility "as soon as practicable" in response to the Village's concerns. The engine house was intended to hold trains during cold weather and to contain toilet and office facilities. The letter further stated that the maintenance facility would be operated primarily during daylight and early evening hours.

Throughout the discussions between the Railroad and Village about the engine house, construction on the maintenance facility was continuing, but the Railroad had not yet applied for zoning or construction permits. When the construction was complete, the Railroad had added a sidetrack adjacent to the main railway and placed on it five rail cars, consisting of three boxcars that allegedly house offices, shops and bathroom facilities, and two permanent 20,000 gallon diesel tank cars with pumping equipment. The Railroad also erected a sand tower to facilitate the loading of sand into locomotive holding tanks. It installed drip pans in the ground adjacent to the fueling area to catch fuel that drips during the refueling process. It also installed a hand-pumped septic system because the Village had not given the Railroad permission to connect to the municipal sewer line.

Between June 1992 and early 1993, the maintenance facility became operational, but the plans for the engine house had not progressed. In March and May 1993, the Village wrote to the Railroad in an attempt to learn when construction on the engine house would begin. In a May 12, 1993 letter, George D. Fosdick, the mayor of the Village, again wrote concerning the Village's growing concerns:

We mutually agreed not to pursue litigation over the location of this facility ... and in return, New York, Susquehanna and Western Railway agreed to commence construction of the engine house this spring....

Within the past year, the situation has continued to become progressively worse. In fact, during several public municipal meetings, numerous Ridgefield Park residents that reside in the affected area have complained that the noise emanating from the idling trains, coupled with the unpleasant odor of diesel fuel is unbearable.

The Village received no response to its March and May letters to the Railroad, and the proposed engine house was never built.

The Village instituted this action in November 1993, seeking a determination requiring the Railroad to obtain municipal permits, to permit municipal inspections, to cease the maintenance of a public nuisance, and to cease operations at the maintenance facility until the municipal requirements were met. The Village alleged that the Railroad was in violation of local zoning ordinances and that the Railroad had breached an implied contract to construct an engine house designed to minimize noise and air pollution. The Village further alleged that the "excessive noise and noxious fumes have destroyed the peace and quiet enjoyment of a residential neighborhood," and that the public health, safety, and welfare were threatened. The Village supported its request for equitable relief with affidavits of neighbors affected by the maintenance facility and of Village officials who were refused entry in their efforts to inspect the maintenance facility.

In February 1998 the trial court granted the Railroad's summary judgment motion because it found that pursuant to the ICCTA the STB exercises exclusive regulatory jurisdiction over matters relating to authorization of construction of railroad facilities. The court noted that a contrary holding would allow the Village to interfere with railroad activity in contravention of the ICCTA's stated purpose of decreasing regulation of railroads.

The Appellate Division affirmed, with modifications, the trial court's grant of summary judgment to the Railroad. *Village of Ridgefield Park v. New York, Susquehanna and Western Railway Corp.*, 318 *N.J.Super.* 385, 724 *A.2d* 267 (App.Div.1999). The Appellate Division concluded "that all state action with any eco-

nomic impact on railroads was preempted by the Act and that the states retained a certain residuum of historic police powers, but presumably those not related to railroad service, operations and physical properties or structures." *Id.* at 399, 724 *A.*2d 267.

We granted the Village's petition for certification. 160 *N.J.* 476, 734 *A.*2d 791 (1999). On September 9, 1999, prior to argument before this Court, the STB preliminarily interpreted the preemptive effect of the ICCTA in *Borough of Riverdale Petition for Declaratory Order, The New York Susquehanna and Western Railway Corporation,* 1999 *WL* 715272 (S.T.B. September 9, 1999), *available in* <http://www.stb.dot.gov>, STB Finance Docket No. 33466. The *Riverdale* proceeding involved that Borough's attempt to require permits and to otherwise restrict the Railroad's construction and operation of a truck terminal and food processing facility on its property. We now affirm the judgment of the Appellate Division, but modify that judgment to reflect the STB's less preemptive *Riverdale* decision. We remand to the Law Division for further proceedings in anticipation of the STB's more comprehensive interpretation of the preemptive effect of the ICCTA in its final *Riverdale* decision.

## II

The ICCTA was passed in late 1995 and became effective January 1, 1996. 49 *U.S.C.A.* §§ 701 to 727; §§ 10101 to 16106. It was passed "to abolish the Interstate Commerce Commission" and "to reform economic regulation of transportation." *H.R.Rep. No.* 104–311, at 1 (1995), *reprinted in* 1995 *U.S.C.C.A.N.* 793.

Consistent with the nature of federalism, "[w]e begin by noting that pre-emption is not to be lightly presumed and that the historic police powers of the States are not to be superseded by federal law unless that was the clear and manifest purpose of Congress." *Franklin Tower One, L.L.C. v. N.M.,* 157 *N.J.* 602, 615, 725 *A.*2d 1104 (1999)(brackets and citations omitted). The primary source of Congress' intent is the language of the preemptive statute and the statutory framework surrounding it. *Med-*

*tronic, Inc. v. Lohr,* 518 *U.S.* 470, 484–85, 116 *S.Ct.* 2240, 2250, 135 *L.Ed.*2d 700, 715–16 (1996) (citations omitted).

According to the "General Jurisdiction" provision of the ICCTA, the STB has jurisdiction over

transportation by rail carrier that is—

(A) only by railroad; or

(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

[49 *U.S.C.A.* § 10501(a)(1)(A) and (B).]

The "General Jurisdiction" provision further provides:

The jurisdiction of the [STB] over

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

[49 *U.S.C.A.* § 10501(b)(1) and (2).]

The ICCTA defines "transportation" as

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement . . .

[49 *U.S.C.A.* § 10102(9)(A) and (B).]

The ICCTA defines "railroad" as

(A) a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad;

(B) the road used by a rail carrier and owned by it or operated under an agreement; and

(C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation;

[49 *U.S.C.A.* § 10102(6).]

The ICCTA defines "rail carrier" as

a person providing common carrier railroad transportation for compensation . . .

[49 *U.S.C.A.* § 10102(5).]

The Appellate Division interpreted that statutory language as follows:

> The language of the statute does not expressly limit preemption to strictly "economic regulation" nor does it state that the states retain historic police powers over railroads and their property. We are told, pursuant to the clear language of the statute, that the "construction" and "operation" of the railroad's "facilities" falls within the Board's express and exclusive jurisdiction. 49 *U.S.C.A.* § 10501(b)(1) and (2). By definition, a railroad's "facility," "warehouse," "yard," "property," "instrumentality," and "equipment of any kind related to the movement of passengers or property," "regardless of ownership or an agreement concerning use" are all within the scope of the Act's concept of "transportation." 49 *U.S.C.A.* § 10102(9)(A). Thus, pursuant to the statutory language, the Board appears to have exclusive jurisdiction over everything pertaining to the railroad's facility in the Village mentioned in the Act's definition of transportation, *i.e.*, the tracks and sidetracks, the sand tower, the lube oil and diesel fueling facilities and tanks, the converted box cars, the yard bulls, the proposed engine house, and so on.
>
> The legislative history and policy surrounding the statute may also be considered in determining the scope of a statute's preemption. *Medtronic, Inc. v. Lohr,* 518 *U.S.* at 494, 116 *S.Ct.* 2240. The section-by-section analysis portion of the congressional "history" to the ICC Termination Act, entitled *Section. 10301. General Jurisdiction,* for example, states,
>
>> This provision replaces the railroad portion of former Section 10501. Conforming changes are made to reflect the direct and complete pre-emption of State *economic regulation* of railroads.... The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the Federal policy of occupying the entire field of economic regulation of the interstate rail transportation. *Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.*
>>
>> [H.R. Conf. Rep. No. 104–422, Dec. 18, 1995; (emphasis supplied).]
>
> When the Act was adopted, Congress retained the section entitled general jurisdiction, delineated as § 10501. However, the Congressional intent stated above with regard to the proposed § 10301 readily applies to § 10501. Both sections cover the same topic, general jurisdiction. The only distinction is the section number assigned. From the language in this legislative history, Congress surely intended the Act to preempt all State *economic* regulation of railroads. But it is also apparent from the noted history that Congress intended the states retain certain police powers reserved by the Constitution. We conclude that all state action with any economic impact on railroads was preempted by the Act and that the states retained a certain residuum of historic police powers, but presumably those not related to railroad service, operations and physical properties or structures.
>
> A review of the "Rail Transportation Policy" section of the Act reveals the Act's focus is on the deregulation of many aspects of the interstate railroad system, not only on strictly economic aspects. For example, one policy stated is to "reduce

regulatory barriers to entry into and exit from the industry." 49 *U.S.C.A.* § 10101(7). Another policy is to "minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required." 49 *U.S.C.A.* § 10101(2). Another policy is to increase "competition and demand for services." 49 *U.S.C.A.* § 10101(1). The "Policy" section also states that "it is the policy of the United States Government ... (8) to operate transportation facilities and equipment without detriment to the public health and safety." 49 *U.S.C.A.* § 10101(8). The policy section also states that safety, safe and suitable working conditions, unlawful discrimination, anti-trust violations, and energy conservation are policy considerations. *Id.* at (3), (11), (12) and (14). However, the dominant public policy emphasis is on a very substantial overall deregulation of the railroad industry. As aptly stated in *CSX Transportation, Inc. v. Georgia Public Service Commission,* 944 *F.Supp.* 1573, 1583 (N.D.Ga. 1996), "[b]y preempting state regulation of railroad operations, and granting exclusive jurisdiction over the regulation of almost all aspects of railroad operations to the [Board], Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry." The Act obviously intended that national transportation interests dominate over parochial concerns and impulses.

[*Ridgefield Park, supra,* 318 *N.J.Super.* at 398–400, 724 *A.2d* 267.]

Guided by the doctrines of federal preemption and primary jurisdiction, the Appellate Division found that the Village must first seek relief from the STB:

"As the agency with authority delegated from Congress to implement the provisions of the ICC Termination Act, the STB is uniquely qualified to determine whether state law should be preempted." *CSX Transportation, Inc. v. Georgia Public Service Commission,* 944 *F.Supp.* at 1584 (quoting *Medtronic,* 518 *U.S.* at 496, 116 *S.Ct.* 2240.) The STB may act on the problem and devise a plan which gives these troubled citizens a measure of relief. We cannot presume and have no reason to believe that the STB will ignore legitimate citizen complaints. The STB may also choose to spell out the precise contours of the residual state police powers which it finds survive the broadly-phrased federal preemption statute and are compatible with the national policy of railroad deregulation and federal primacy. If so, this present action will be promptly reinstated at the trial level upon plaintiff's application and given every priority towards an expedited resolution.

[*Ridgefield Park, supra,* 318 *N.J.Super.* at 405–07, 724 *A.2d* 267 (footnote omitted).]

In its September 1999 decision the STB preliminarily interpreted the preemptive effect of the ICCTA in *Riverdale, supra,* 1999 *WL* 715272. In that decision the STB stated that the ICCTA preempts all municipal zoning regulations as applied to railroads. "[Z]oning regulations that the Borough would impose clearly could be used to defeat NYSW's maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are

part of interstate commerce. . . . [T]his is the type of interference that Congress sought to avoid in enacting section 10501(b)." *Id.* at \*7.

According to the STB, local land use restrictions are preempted because they "can be used to frustrate transportation-related activities and interfere with interstate commerce. To the extent that they are used in this way (*e.g.,* that restrictions are placed on where a railroad facility can be located), courts have found that the local regulations are preempted by the ICCTA." *Id.* at \*8. Because the manner in which land-use restrictions interfere with interstate commerce is a "fact-bound question," the STB declined to decide the issue comprehensively without the participation of the Railroad. *Ibid.* Accordingly, the STB deferred its decision about whether land-use restrictions "if applied in such a way as not to discriminate against railroads, would significantly interfere with NYSW's railroad operations and interstate commerce." *Ibid.*

Regarding public health and safety matters, the STB observed:

[R]ecent precedent has made it clear that, *to the extent that they set up legal processes that could frustrate or defeat railroad operations, state or local laws that would impose a local permitting or environmental process as a prerequisite to the railroad's maintenance, use, or upgrading of its facilities are preempted because they would, of necessity, impinge upon the federal regulation of interstate commerce.* That means that, while state and local government entities such as the Borough retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce. We cannot go beyond these general principles here without more information as to the particular police power issues that may be involved in this case.

[*Ibid.* (citations and footnotes omitted)(emphasis added).]

Regarding building codes, the STB determined that railroads are exempt from the traditional permitting process but not, as the railroad argues, from most other generally applicable laws:

Given the broad language of 49 *U.S.C.* 10501(b) and the case law interpreting it, *our preliminary view is that local entities such as the Borough can not require that railroads seek building permits prior to constructing or using railroad facilities because of the inherent delay and interference with interstate commerce that such requirements would cause.* At the same time, we believe local authorities can take actions that are necessary and appropriate to address any genuine

emergency on railroad property, and that interstate railroads such as NYSW are not exempt from certain local fire, health, safety and construction regulations and inspections.

[*Id.* at *8.]

Although railroads may not be forced to submit to a local permitting process because of the inherent potential for delay, railroads generally are still subject to state regulation of their facilities. The STB specifically determined that

> state and local entities can enforce in a non-discriminatory manner electrical and building codes, or fire and plumbing regulations, so long as they do not do so by requiring the obtaining of permits as a prerequisite to the construction or improvement of railroad facilities. With regard to the kinds of inspections that are permissible on property owned or used by interstate railroads, the potential for interference depends on the nature of the action by the state or local government and the effect on rail transportation and Board remedies; we see no simple, clear line of demarcation that has been or could be drawn, except that the inspection requirements or local regulations must be applied and enforced in a non-discriminatory manner and that preclearance permitting requirements plainly are preempted. Again, we cannot go beyond these general principles here without more information about particular inspection and similar requirements that may be at issue in this case. Parties may file further information and comment on these issues.

[*Id.* at *8 (citations omitted)(emphasis added).]

The STB stated that there are some aspects of railroading over which it does not have exclusive jurisdiction:

> Many rail construction projects are outside of the Board's regulatory jurisdiction. For example, railroads do not require authority from the Board to build or expand facilities such as truck transfer facilities, weigh stations, or similar facilities ancillary to their railroad operations, or to upgrade an existing line or to construct unregulated spur or industrial team track. In such cases, we can provide advice about how preemption applies, but we have no direct involvement in the process.

[*Id.* at *5 (emphasis added).]

The STB has retained jurisdiction of *Riverdale* and will issue a final *Riverdale* opinion after submissions from the parties in that case and other interested persons. *See* Notice of opening of declaratory order proceeding, 64 *Fed.Reg.* 51,179–02 (1999). The STB noted that its "preliminary conclusions, of course, could change depending on [its] understanding of the facts after [the STB] ha[s] reviewed the parties' comments, evidence and arguments." The STB also noted that "there may be additional unresolved preemption issues as to which parties believe the

Board should provide clarification that involve the extent to which state and local governments may regulate a railroad's construction plans or the operation of its facilities." *Ibid.*

We note that the Hackensack Meadowlands Development Commission (HMDC) has submitted comments in the STB proceeding advocating a narrow interpretation of the preemptive effect of the ICCTA. The HMDC is interested in the outcome of that proceeding because the Railroad has constructed a five-acre parking lot without the approval of the HMDC in an environmentally sensitive area over which the HMDC has jurisdiction. The HMDC argues that that activity contravenes the HMDC's statutorily authorized control over the use of that land pursuant to *N.J.S.A.* 13:17–11. The HMDC suggested in its comments to the STB that "reasonable procedures can be developed [that] allow railroads to operate and expand their services while at the same time being responsible citizens of the community." .

### III

Our review of the STB's preliminary *Riverdale* decision reveals that it is less preemptive but otherwise analytically consistent with the Appellate Division's interpretation of the ICCTA. Although acknowledging that the STB had not yet defined its jurisdiction, the Appellate Division found preemption of all police-power regulations with "any economic impact." *Ridgefield Park, supra,* 318 *N.J.Super.* at 399, 724 *A.*2d 267. The STB, however, stated that the ICCTA does not preempt "non-discriminatory" public health and safety regulations that do not foreclose or restrict a railroad's ability to conduct its operations. *Riverdale, supra,* 1999 *WL* 715272 at *9. The STB observed that although states cannot require permits as prerequisites to the maintenance or construction activities of railroads, states can enforce local fire, health, safety and construction regulations against railroads and can inspect railroad facilities. *Ibid.* The STB also held that states are permitted "to address any genuine emergency on railroad property." *Ibid.*

■ The Village seeks to enjoin through this suit the alleged public nuisance maintained by the Railroad and to regulate the Railroad's maintenance facility pursuant to generally applicable health, safety, zoning, and land use laws. The Railroad's position to date has been that no regulation whatsoever by the Village is permissible. We anticipate that the Railroad's submission, in whole or in substantial part, to the regulation that we authorize in this opinion will better define any areas of disagreement between the parties. Because on this record we are uncertain about the character and scope of the ultimate preemption issues, if any, that will divide the parties, and taking into account the STB's ongoing effort to describe more specifically the preemptive effect of the ICCTA, we consider it premature to attempt to resolve comprehensively the ICCTA's preemptive effect. Nevertheless, we are prepared to grant the Village some of the relief it seeks.

That state courts generally have jurisdiction to enforce rights deriving from federal statutory law is well settled. See *Martinez v. California*, 444 *U.S.* 277, 283 n. 7, 100 *S.Ct.* 553, 558 n. 7, 62 *L.Ed.*2d 481, 488 n. 7 (1980); *Maisonet v. Department of Human Serv., Div. of Family Dev.*, 140 *N.J.* 214, 221, 657 *A.*2d 1209 (1995). We note that that principle is implicated here only indirectly. Although the preemptive effect of the ICCTA is a matter of federal statutory law, the ordinances sought to be applied by the Village are routinely enforced in this state's courts.

■ Consistent with the STB's opinion in *Riverdale*, we hold that the Railroad may not deny the Village access for reasonable inspection of its maintenance facility. We further hold that although the Village may not require permits of the Railroad, the Railroad must notify the Village when it is undertaking an activity for which another entity would require a permit. The Village may enforce its local fire, health, plumbing, safety and construction regulations to the extent they are applicable to the existing maintenance facility. Because the "maintenance facilities" consist essentially of two diesel tank cars with pumping equipment, three boxcars containing administrative offices, shops and bathroom

facilities, and a hand-pumped septic system, a certain degree of pragmatism on the part of the Village will be necessary in attempting to apply its relevant ordinances and regulations to the Railroad's facilities. Because of the nature of those facilities, literal compliance with all of the requirements of the Village's ordinances and regulations may be impractical, and may not be necessary to protect the public interest.

We envision that it will be the rare situation when fairly enforced fire, health, plumbing, safety, or construction regulations interfere with a railroad's operations. In the event that conflicts arise over the Village's attempted enforcement of those regulations, either party is free to apply to the Law Division for such relief consistent with this opinion as may be appropriate.

The Village also seeks to enforce its site plan approval ordinance on the Railroad's maintenance facility. The STB has given us little guidance on this issue as it has not decided whether land use regulations encompassing site plan approval provisions, "if applied in such a way as not to discriminate against railroads, would significantly interfere with ... railroad operations and interstate commerce." *Riverdale, supra,* 1999 *WL* 715272 at *8. The STB noted that land use regulations are preempted insofar as they are "used to frustrate transportation-related activities and interfere with interstate commerce." *Ibid.* Absent a better-developed record, the STB declined to fully decide the issue. *Ibid.*

█ Obviously, the nature of the Railroad's facilities does not make it feasible to subject them to the usual scope of review contemplated by municipal site plan ordinances. See *N.J.S.A.* 40:55D–41 (authorizing site plan ordinances requiring review of location of structures, vehicle and pedestrian circulation, preservation of natural resources, parking, lighting, screening and landscaping). Nevertheless, the record informs us that in 1992 the Railroad submitted for review by the Village engineer a site plan depicting its facilities, and subsequently forwarded supplemental information requested by the engineer. The Village apparently ceased, at least temporarily, its review of the Railroad's site plan.

Because the parties voluntarily commenced the site plan review process before the litigation commenced, we anticipate that to now require the Railroad to submit again to site plan review, tempered by the pragmatic considerations that should guide the Village's review-process, will not foreclose or restrict the Railroad's ability to conduct its operations. Consistent with the STB's disposition in *Riverdale, supra,* the Village's authority to review the Railroad's site plan does not include the power to require approval of the site plan as a condition of the Railroad's continued use of its maintenance facility.

 Because zoning regulations imposed by the Village "clearly could be used to defeat [the Railroad's] maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce," *ibid.* at *7, the Village may not dictate the location on its right-of-way of the Railroad's maintenance facility. In the event the Village remains of the view that the Railroad's siting decision is arbitrary, unreasonable and contrary to the interests of its citizens, the Village is free to seek relief on that issue from the STB.

 Regarding the Village's common law nuisance claim in connection with the noise and air pollution the maintenance facility produces, we agree with the Appellate Division that our courts cannot adjudicate common law nuisance claims against the Railroad because to do so would infringe on the STB's exclusive jurisdiction over the location and operations of railroad facilities. *Ridgefield Park, supra,* 318 *N.J.Super.* at 404–05, 724 *A.2d* 267.

We are mindful of the difficulties that the haphazard construction of railroad facilities may cause to a railroad's host community, as when a railroad constructs a facility without involving the neighbors of the facility, the local government, or other interested parties in the decision-making process. We are also mindful, however, of the declaration by Congress that states may not interfere with the operational aspects of railroading and that localized concerns may not burden the nationwide system of railroads. We assume that most of the concerns of communities

that host railroad facilities may be resolved without litigation and without sacrificing the Congressional goal of deregulation. Indeed, at oral argument the Court was informed that the Railroad and the Village have not exhausted all efforts at the voluntary reconciliation of their differences.

The judgment of the Appellate Division is modified and the matter remanded to the Law Division for such further proceedings as may be required to implement our disposition of this appeal.

LONG, J., dissenting.

I would affirm the decision of the Appellate Division requiring this matter to proceed before the STB, the agency authorized by Congress to implement the ICCTA. 49 *U.S.C.A.* § 10501. Nothing in the after-decided *Riverdale* case, *supra*, justifies a different outcome. 1999 *WL* 715272. By its own terms, the STB's ruling in *Riverdale* is preliminary only; it is subject to change depending on a full review of the facts. *Id.* at *8. Indeed, as the STB itself acknowledged, there may be additional unresolved preemption issues in *Riverdale*. *Id.* at *1 n. 2. Our ruling here is premature and out of conformity, not only with the principles of preemption, but with the well-established rule that litigation is to proceed in a cohesive, and not piecemeal, manner.

In *Riverdale*, the STB acknowledged that state and local entities "retain certain police powers," so long as their actions do not "have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burden[ing] interstate commerce." *Id.* at *5–6. That agency refused, however, to detail which powers it retained and which it ceded "without more information as to the particular police power issues that may be involved in this case." *Id.* at *6.

This case should be heard in the first instance by the STB. After a preemption determination by that agency based on these particularized facts, the actual contours of the state case will be clear; at that time, meaningful action may be taken by local authorities subject to state judicial review. In my view, the

majority has created a haphazard scheme for addressing the difficult issue presented by this case.

GARIBALDI and VERNIERO, JJ., join in Justice LONG'S opinion.

*For modification and remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN and COLEMAN—4.

*For affirmance*—Justices GARIBALDI, LONG and VERNIERO—3.