**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1246-22

CONSOLIDATED RAIL
CORPORATION,

     Plaintiff-Respondent,

v.

CITY COUNCIL OF THE
CITY OF JERSEY CITY,

     Defendant-Appellant,

and

JERSEY CITY PLANNING
BOARD,

     Defendant-Respondent.

_____

Argued March 11, 2024 – Decided March 27, 2025

Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4542-21.

Thomas J. Slattery, Assistant Corporation Counsel, argued the cause for appellant (Peter J. Baker, Corporation Counsel, attorney; Thomas J. Slattery, on the briefs).

Kevin J. Coakley argued the cause for respondent Consolidated Rail Corporation (Connell Foley LLP, attorneys; Kevin J. Coakley and Patrick J. McAuley, of counsel; Ryan A. Benson, on the brief).

Vincent J. La Paglia argued the cause for respondent Jersey City Planning Board.

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant City Council of the City of Jersey City (the Council) appeals from the November 16, 2022 judgment of the Law Division removing real property owned by plaintiff Consolidated Rail Corporation (Conrail) from the non-condemnation area in need of redevelopment (AINR) established by the Council in Resolution No. 21-692 (Resolution). We affirm.

I.

Conrail is a rail carrier and owner of twenty-eight parcels in Jersey City (the Property).[1] The parcels are contiguous with the active National Docks

---

[1] The Property is designed in the tax record of Jersey City as Block 10901, Lots 92, 93, 108, 109, 111, 118, 120, 121, 122 and 123; Block 8401, Lots 2, 3, 8, 9, 10, 11, 13, 14, and 15; Block 6902, Lots 1, 2, 3, 4, 5, 8, and 35; and Block 9801, Lots 1 and 19.

freight rail line running north to south through the center of the Property. The active railroad tracks are on some, but not all, of the parcels that comprise the Property.

On February 10, 2021, the Council adopted Resolution No. 21-124 (Preliminary Resolution) directing defendant Jersey City Planning Board (Board) to undertake a preliminary investigation to determine whether forty-three lots (Sixth Street Embankment Study Area), which included the Property, satisfied the statutory criteria in the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -89, for designation as an AINR. The Preliminary Resolution divided the Sixth Street Embankment Study Area into two groups: (1) eight lots not owned by Conrail (Condemnation Study Area); and (2) the remaining thirty-five lots, including the Property (Non-Condemnation Study Area). The Council sought a determination from the Board of whether the lots in the Condemnation Study Area should be designated as an AINR with the power of eminent domain and the lots in the Non-Condemnation Study Area should be designated as an AINR without the power of eminent domain.

In connection with the preliminary investigation, Timothy Krehel, the City's Planner, prepared a report addressing the Non-Condemnation Study Area. Krehel described most of the lots comprising the Property as vacant, but noted

that an active freight line runs across seven of the lots. He characterized five of the lots as "internal" and not having access to a street or a street address, but being adjacent to active rail lines. The remaining lots were described as having inactive rail infrastructure, including an inactive train trestle, or undeveloped, with one lot being adjacent to an active rail line operated by the Port Authority of New York and New Jersey. Of the parcels comprising the Property, one lot borders Newark Avenue, one borders County Road 139, and four are crossed by elevated spurs of the New Jersey Turnpike Extension.

Krehel's report concludes the Property and the other lots in the Non-Condemnation Study Area qualify as an AINR under N.J.S.A. 40A:12A-5(c). That statute authorizes the Council to declare a delineated area to be an AINR if it is

> unimproved vacant land that has remained so for a period of ten years prior to adoption of the resolution, and that by reason of its location, remoteness, lack of means of access to developed sections or portions of the municipality, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital.
>
> [N.J.S.A. 40A:12A-5(c).]

The report stated that except for the portions of the parcels on which the active rail line is located, the Property has been vacant and unimproved for over ten

years. The report also asserts that several lots in the Property "have access issues due to their location, topography issues from proximity to the Palisades, and the possibility of soil contamination issues."

Krehel's report also opines the Property qualifies as an AINR under N.J.S.A. 40A:12A-5(h). That statute authorizes the Council to designate an area as an AINR if "[t]he designation . . . is consistent with smart growth planning principles adopted pursuant to law or regulation." N.J.S.A. 40A:12A-5(h). The report does not explain how designation of the Property as an AINR is consistent with smart growth principles, which it identifies as "concentrate[d] growth in compact walkable urban centers to avoid sprawl."

Finally, the report states the Property qualifies as an AINR under N.J.S.A. 40A:12A-3. That statute provides an ANIR "may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but the inclusion of which is found necessary, with or without change in their condition, for the effective redevelopment of the area of which they are a part." N.J.S.A. 40A:12A-3. The report does not explain why inclusion of the Property in the AINR is necessary to redevelop other parcels in the Non-Condemnation Study Area or the Sixth Street Embankment Study Area.

Conrail submitted written objections to the Board contesting inclusion of the Property in an AINR. Conrail argued: (1) the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C.A. §§ 701 to 727 and §§ 10101 to 16106, preempts local zoning and land-use regulation of the Property, including designation as an AINR, because the Property is the site of an active rail line; (2) the Property does not meet the statutory criteria for designation as an AINR; and (3) declaring the Property in need of redevelopment would be a waste of time and money because Conrail has no desire to use the Property for any purpose other than railroad use.

At the Board's July 6, 2021 meeting, Krehel testified that getting to the Property is a "challenge" but admitted "[t]here are access points." In addition, he acknowledged Conrail presumably uses the lots without active rail operations to access the lots with active rail operations. Krehel did not explain why the Property was unlikely to be developed through private capital in the event its railroad use was abandoned or why Conrail would permit the Property to be developed for any use other than railroad use. The Board later adopted a resolution recommending the Council designate the Property as an AINR.

Conrail thereafter submitted to the Council written objections to inclusion of the Property in an AINR. On October 14, 2021, the Council, without

6

discussion, adopted the Resolution designating the Non-Condemnation Study Area, including the Property, as an AINR.

On November 21, 2021, Conrail filed a complaint in lieu of prerogative writs in the Law Division challenging the actions of the Board and the Council. The complaint alleged: (1) designation of the Property as an AINR was preempted by the ICCTA; and (2) the record contains insufficient evidence to establish the statutory criteria for designation of the Property as an AINR.

On November 16, 2022, the trial court issued an oral decision in which it concluded the ICCTA preempts the Council's authority to designate the Property as an AINR. The court reasoned that the AINR designation, an exercise of zoning or land-use regulatory authority, would have an economic impact on Conrail's use of the Property for railroad purposes, which is prohibited by the ICCTA. Thus, the court concluded the Council's designation of the Property as an AINR was arbitrary, capricious, and unreasonable.

The trial court also found that if designation of the Property as an AINR is not preempted by the ICCTA, the Council lacked sufficient evidentiary support to meet the statutory criteria for the designation. With respect to N.J.S.A. 40A:12A-5(c), the court found no factual basis for the Council's conclusion that the Property had been vacant and unimproved for over ten years,

and is unlikely to be developed through private capital because of its location, remoteness, lack of access to developed areas of Jersey City, topography, or soil. The court noted the Property has supported an active rail line since around 1871 and continues to be used for that purpose.

The court also found the Council failed to satisfy N.J.S.A. 40A:12A-5(h) because it did not identify the smart growth planning principles adopted by law or regulation with which the AINR designation is consistent. Finally, the court found the Council failed to establish inclusion of the Property in the AINR was necessary for effective redevelopment of other parcels in the AINR under N.J.S.A. 40A:12A-3.

A November 16, 2022 order memorialized the trial court's decision and directed removal of the Property from the AINR.

This appeal follows. The Council argues the trial court erred when it: (1) concluded designation of the Property as an AINR was preempted by the ICCTA; (2) failed to distinguish Conrail-owned parcels not used for railroad purposes from Conrail-owned parcels on which the active rail line is operated; and (3) found Krehel's report was insufficient to meet the statutory criteria for an AINR designation of the Property.

## II.

"[W]hen reviewing the decision of a trial court that has reviewed municipal action, we are bound by the same standards as was the trial court." Fallone Props., L.L.C. v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). With respect to land-use decisions, "public bodies, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion." Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 597 (2005). Therefore, "[t]he proper scope of judicial review is not to suggest a decision that may be better than the one made by the board, but to determine whether the board could reasonably have reached its decision on the record." Ibid. As a reviewing court, we are not to substitute our judgment for that of the local board unless there is a clear abuse of discretion. Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 82 (2002) (citing Med. Realty Assocs. v. Bd. of Adjustment, 228 N.J. Super. 226, 233 (App. Div. 1988)).

However, the threshold issue in this case is whether the trial court erred when it determined the ICCTA preempts the Council's inclusion of the Property in an AINR. That issue requires interpretation of federal law and, therefore, our review is de novo. St. Peter's Univ. Hosp. v. N.J. Bldg. Laborers Statewide Welfare Fund, 431 N.J. Super. 446, 462 (App. Div. 2013) ("[T]he question of

preemption is a legal issue that we review de novo."); see also Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 535 (2013) ("In construing the meaning of a statute . . . , our review is de novo . . . .").

Under the ICCTA, the federal Surface Transportation Board (STB) has "exclusive" jurisdiction over the following:

> (1)   transportation by rail carriers, and the remedies provided in [the ICCTA] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2)   the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State . . . .
>
> [49 U.S.C.A. § 10501(b).]

The "remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under . . . State law." Ibid.

"[T]ransportation" is broadly defined in the ICCTA as:

> (A)   a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail,

10

regardless of ownership or an agreement concerning use; and

(B)   services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . .

[49 U.S.C.A. § 10102(9).]

The ICCTA defines "rail carrier" to include a "person providing common carrier railroad transportation for compensation," and "railroad" to include:

(A)   a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad;

(B)   the road used by a rail carrier and owned by it or operated under an agreement; and

(C)   a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation.

[49 U.S.C.A. § 10102(6).]

The Property, which contains railroad tracks, facilities, equipment, yards, and grounds used or necessary for Conrail's operation of an active railroad, falls within these definitions. It is undisputed that portions of the Property contain active railroad tracks, as well as inactive rail infrastructure, including an inactive train trestle. In addition, as Conrail convincingly argues, the portions of the Property that are undeveloped provide a buffer between the active railroad and

11

adjoining properties, both for the protection of the public and to provide space in which Conrail can access the active railway and, if necessary, expand rail operations.

The scope of the ICCTA preemption of local zoning and land-use regulation was addressed by our Supreme Court in Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp., 163 N.J. 446 (2000). There, a railroad maintained a right-of-way through the municipality on which it operated an active railway. Id. at 450. The railroad began construction of a train maintenance facility on a parcel adjacent to the active railway without applying for zoning or construction permits and without otherwise notifying the municipality of its plans. Ibid. The railroad subsequently installed a sidetrack adjacent to the main railroad, on which it placed five rail cars, including boxcars that housed offices, shops, and bathroom facilities, as well as other equipment and two diesel tank cars with pumping equipment. Id. at 451.

The municipality contacted the railroad, seeking to mitigate the noise and odors emanating from the maintenance facility. Id. at 451-52. Although the railroad stated its intention to construct an engine house to contain the noise and air pollution, it failed to do so. Ibid.

A-1246-22

Responding to complaints by residents of noise and odors from the maintenance facility, the municipality filed a complaint in the Law Division alleging the railroad was in violation of local zoning ordinances and had breached an implied contract to construct the engine house. Id. at 452. It sought a judgment requiring the railroad to obtain municipal permits, to allow municipal inspections, to cease a public nuisance, and to halt operation of the maintenance facility until municipal requirements were met. Ibid.

The trial court granted summary judgment to the railroad, finding that under the ICCTA, the STB had exclusive regulatory jurisdiction over matters relating to the construction of railroad facilities. Ibid. We affirmed with modifications. Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp., 318 N.J. Super. 385 (App. Div. 1999). We held that "all state action with any economic impact on railroads was preempted by the [ICCTA] and that the states retained a certain residuum of historic police powers, but presumably those not related to railroad service, operations and physical properties or structures." Id. at 399.

The Supreme Court modified our judgment and remanded for further proceedings. Village of Ridgefield Park, 163 N.J. at 453. The Court explained:

> The ICCTA was passed in late 1995 and became
> effective January 1, 1996. 49 U.S.C.A. §§ 701 to 727,

13

§§ 10101 to 16106. It was passed "to abolish the Interstate Commerce Commission" and "to reform economic regulation of transportation." H.R. Rep. No. 104-311, at 1 (1995), reprinted in 1995 U.S.C.C.A.N. 793.

Consistent with the nature of federalism, "[w]e begin by noting that pre-emption is not be lightly presumed and that the historic police powers of the States are not be superseded by federal law unless that was the clear and manifest purpose of Congress." Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 615 (1999) (brackets and citations omitted). The primary source of Congress' intent is the language of the preemptive statute and the statutory framework surrounding it. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484-85 (1996).

[Id. at 453-54.]

In addition to the provisions of the ICCTA, the Court examined its legislative history and a then-recent decision of the STB in Borough of Riverdale Petition for Declaratory Order – The N.Y. Susquehanna and W. Ry. Corp., STB Finance Docket No. 33466, 1999 STB LEXIS 531 (S.T.B. Sep. 9, 1999). In the STB matter, Riverdale Borough attempted to require permits and to otherwise restrict a railroad's construction and operation of a truck terminal and food processing facility on its property. Id. at 453. The STB held that "zoning regulations that the Borough would impose clearly could be used to defeat [the railroad's] maintenance and upgrading activities, thus interfering with the

efficiency of railroad operations that are part of interstate commerce . . . . [T]his is the type of interference that Congress sought to avoid in enacting section 10501(b)." Borough of Riverdale, 1999 STB LEXIS 531, at *17-18.

The Court noted that

> [a]ccording to the STB, local land use restrictions are preempted because they "can be used to frustrate transportation-related activities and interfere with interstate commerce. To the extent that they are used in this way (e.g., that restrictions are placed on where a railroad facility can be located), courts have found that the local regulations are preempted by the ICCTA."
>
> [Village of Ridgefield Park, 163 N.J. at 457 (quoting Borough of Riverdale, 1999 STB LEXIS 531, at *18).]

In addition, the STB determined that "the manner in which land-use restrictions interfere with interstate commerce is a 'fact-bound question'" that turns on whether the contested land-use restriction "if applied in such a way as not to discriminate against railroads, would significantly interfere with [the railroad's] railroad operations and interstate commerce." Ibid.

The STB also determined that "while state and local government entities . . . retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce." Ibid. The STB

determined that Riverdale could not require the railroad to obtain a building permit because of the inherent delays and interference with interstate commerce that such a requirement would cause, but could take actions necessary and appropriate to address genuine emergencies on railroad properties and to enforce local fire, health, safety, and construction regulations and inspections. Id. at 457-58.

Although noting the STB had not yet fully defined its jurisdiction, the Court held the ICCTA did not preclude Ridgefield Park from accessing railroad property for reasonable inspection. Id. at 460. The Court also held the railroad must inform Ridgefield Park when it is undertaking any activity for which another entity would require a permit. Ibid. In addition, the Court held the municipality could enforce its fire, health, plumbing, safety, and construction regulations to the maintenance facility, ibid., and require the railroad to submit a site plan for the maintenance facility, but could not make approval of the plan a condition for the railroad's continued use of the facility, id. at 461-62. Nor, the Court held, could the municipality dictate the location of the maintenance facility on the railroad's property because zoning regulations could be used to defeat maintenance and upgrading activities on the railroad property. Id. at 462.

A-1246-22

The Council argues its AINR designation has no impact on Conrail's use of the Property for railroad purposes and will be legally significant only if Conrail abandons such use. Thus, the Council contends, ICCTA preemption does not apply. Conrail argues the AINR designation vests broad powers in the municipality over the regulation of the Property which are preempted by the ICCTA. We agree with Conrail's arguments.

An AINR designation is the first step in imposing a redevelopment plan on the parcels in the designated area. "No redevelopment project shall be undertaken or carried out except in accordance with a redevelopment plan adopted by ordinance of the municipal governing body, upon its finding that the specifically delineated project area is located in an [AINR]." N.J.S.A. 40A:12A-7(a). The redevelopment plan "shall" indicate "[p]roposed land uses and building requirements . . . ." N.J.S.A. 40A:12A-7(a)(2). In addition, the "redevelopment plan shall supersede applicable provisions of the development regulations of the municipality or constitute an overlay zoning district within the redevelopment area." N.J.S.A. 40A:12A-7(c). The "redevelopment plan becomes either all or part of the zoning for the redevelopment area." Weeden v. City Council of the City of Trenton, 391 N.J. Super. 214, 224 (App. Div.

2007).  In other words, an AINR designation is a means of imposing zoning and land-use regulations on the parcels in the AINR.

While we acknowledge that the Council has undertaken only the preliminary stage of the redevelopment process, we conclude that the broad preemption in the ICCTA of zoning and land-use regulation of railroad properties encompasses an AINR designation.  The designation "clearly could be used to defeat" Conrail's railroad operations on the Property and, as a result, impact interstate commerce.  See Borough of Riverdale, 1999 STB LEXIS 531, at *17-18.  It is the potential of a zoning or land-use regulation to interfere with railroad operations that triggers ICCTA preemption.  The Council's designation of the Property as an AINR unquestionably creates the potential for redevelopment of the Property, even though the Council concedes that such redevelopment would be preempted by the ICCTA while the Property is in railroad use.  However, the AINR designation, even if the Council does not undertake redevelopment, creates regulatory complexity and uncertainty with respect to the Property that could deter Conrail from investing in freight rail transportation activities on the Property.  The municipality has made official its intention to redevelop the Property so that it may be put to uses other than as an active railroad.  As a result, the regulatory posture of the municipality with

18

respect to the Property changed with the AINR designation, and the potential for zoning and land-use regulation of the property increased.

We are not persuaded by the Council's argument that even if ICCTA preemption applies to the parcels on which the active railroad is located, an AINR designation is permitted for the remaining parcels that comprise the Property. The record establishes the Property is a contiguous plot of land with an active railroad running through its center. The tax map designations of various lots does not alter the essential nature of the parcel as a single property in railroad use. The ICCTA defines the STB's exclusive jurisdiction to include not just rail lines but any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property." 49 U.S.C.A. § 10102(9). In addition, the ICCTA defines railroads as including facilities, yards, and "ground" used for transportation, as well as those "necessary for transportation." 49 U.S.C.A. § 10102(6).

Krehel conceded that Conrail presumably uses the lots without active rail service to access the lots with active rail service. Such lots serve as a buffer to protect the public from rail operations and vice versa. See City of Creede, Co-Petition for Declaratory Order, STB Finance Docket No. 34376, 2005 STB LEXIS 486, at *15 (S.T.B. May 3, 2005) ("[E]xtra width on the sides of the track

allows room to maintain or upgrade the track, to provide access to the line, to serve as a safety buffer, and to ensure that sufficient space is left available for more tracks and other rail facilities to be added, as needed, as rail traffic changes and grows, among other uses."). In addition, it is the Council's burden to demonstrate the Property "is not and will not be needed for rail purposes" to avoid ICCTA preemption. Id. at *16. It made no such showing.[2]

Because we conclude the Council's designation of the Property as an AINR is preempted by the ICCTA, we need not decide if the Council satisfied the statutory criteria for the AINR designation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

---

[2] The Council's concession that redevelopment of the Property while it is in railroad use would be preempted raises the question of why it expended resources to include the Property in the AINR. The Council argues that in the event Conrail abandons its use of the property, the AINR designation will be in place to permit redevelopment of the Property for parks, open space, and light rail use. The Council has expressed concern that in the absence of an AINR designation, Conrail will abandon railroad use of the Property and sell it to a developer, frustrating Council's proposed redevelopment plans. This argument appears to concede the Property is likely to be developed through the instrumentality of private capital if no longer in railroad use. In any event, as we understand it, if Conrail decides to abandon railroad use of the Property, it must seek approval for that abandonment from the STB. We do not address the question of whether the Council will have an opportunity to revisit designation of the Property as an AINR should Conrail ever petition the STB to abandon railroad use of the Property.

A-1246-22