### In re Appeal of Vermont Railway

[769 A.2d 648]

No. 99-350

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed December 8, 2000

Motions for Reargument and Stay Denied January 5, 2001

*Eric R. Benson*, Burlington, for Appellant.

*Joseph E. McNeil*, City Attorney & Corporation Counsel, and *Kimberlee J. Sturtevant*, Assistant City Attorney, of *McNeil, Leddy & Sheahan*, Burlington, for Appellee.

**Morse, J.** Vermont Railway appeals the environmental court's ruling on summary judgment in favor of the City of Burlington. The court determined that the majority of permitting conditions imposed on a facility located at 207 Flynn Avenue in Burlington and owned by Vermont Railway are not preempted by federal legislation. Vermont Railway raises numerous issues on appeal, but essentially argues that the application of the City of Burlington's zoning ordinances to its facility at 207 Flynn Avenue is preempted entirely by the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. §§ 10101-16106. We disagree and affirm the decision of the environmental court.

The undisputed material facts are as follows: Vermont Railway is a railroad engaged in the interstate transportation of both passengers and freight by rail. It is the surviving corporation of the merger between itself and Cliffside Leasing Company. Vermont Railway succeeded to Cliffside Leasing's ownership interest in the property located at 207 Flynn Avenue in Burlington by virtue of the merger.

Located at the property are antique shops, a roofing company, metal works, storage facilities, a salt shed and semi-tractor storage. Vermont Railway uses the property for the storage and transfer of freight as well. It also stores equipment at the facility and undertakes repairs there. Before its merger with Vermont Railway, Cliffside Leasing had received a series of permits from the City of Burlington

in connection with the various uses of the property. These permits contained numerous conditions governing the property, many of which were specifically addressed to the expansion and use of the salt shed on the premises.

Cliffside Leasing was in the process of challenging several of these conditions at the time of its merger with Vermont Railway. Vermont Railway also received permit approval subject to conditions with respect to operation of the salt shed facility and appealed to the environmental court. The court consolidated the appeals, and the case proceeded in the name of Vermont Railway. At issue were the cumulative conditions imposed by the City on the operations of the salt shed facility by Vermont Railway.

Vermont Railway argued that all zoning regulation of the salt shed operation by the City was preempted by federal legislation governing railway safety and economic activity associated with railway operations. The City argued that Vermont Railway was foreclosed from challenging the conditions by its and Cliffside Leasing's failure to appeal their imposition in prior permits and by the lack of changed circumstances which would otherwise allow Vermont Railway to revisit the conditions. The City also argued that regulation of the salt shed facility via its municipal ordinances was not preempted by federal legislation.

Finding that the acquisition of the facility by a railway company in conjunction with the passage of the ICCTA constituted changed circumstances sufficient to allow review of the permitting conditions, the court determined that portions of four conditions were preempted by the ICCTA and therefore needed to be amended. The court concluded that the remaining conditions, however, were neither preempted as regulation of railway safety, nor preempted as regulation of economic activity associated with railway operations. Vermont Railway now appeals.

In 1995, Congress enacted the ICCTA, which abolished the Interstate Commerce Commission, established the Surface Transportation Board (STB) and granted the STB jurisdiction over certain aspects of interstate rail activity. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995), codified at 49 U.S.C. §§ 10101-16106. Its purpose was to deregulate the economic activity of surface transportation industries. H.R. Rep. No. 104-311, at 82 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 793 (indicating bill passed in lieu of original Senate bill reformed economic regulation of transportation and substantially deregulated the rail and motor carrier industries); see

also S. Rep. No. 104-176, at 2, 5 (1995) (indicating that bill as originally proposed in the Senate was intended to "significantly" reduce regulation and continue the "deregulation theme" with regard to surface transportation industries). Nevertheless, it retained the traditional police powers reserved to the states by the Constitution. H.R. Rep. No. 104-311, at 95-96, reprinted in 1995 U.S.C.C.A.N. at 807-08 (noting with respect to jurisdictional provision of bill that explicit disclaimer regarding states retaining their residual police powers was unnecessary; although Congress intended to preempt all state regulation of *economic* activity, including state securities regulation, the states nevertheless "retain the police powers reserved by the Constitution" under the bill). Within the ICCTA is found this explicit preemption provision which states:

(b) The jurisdiction of the [STB] over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is *exclusive*. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are *exclusive and preempt* the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added); see also 49 U.S.C. § 10102(9)(A) (defining "transportation" as "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail").

"Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (alterations in original). In other words, there is a presumption that "state and local regulation of

health and safety matters can constitutionally coexist with federal regulation." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985). The party seeking to overcome this presumption bears a heavy burden. *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). Furthermore, the scope of preemption, if any, is to be determined with this presumption in mind. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Finally, when Congress has explicitly addressed the issue of preemption in its legislation, there is ordinarily no occasion to look beyond the text of the statute to determine its reach with regard to preemption. *Id.* at 484-85; *Cipollone*, 505 U.S. at 517.

Both parties argue that we are obligated to give deference to the STB's interpretation of the scope of the preemption provision of the ICC Termination Act, as the agency charged with administering the Act. While it is true that generally an agency's interpretation of an ambiguous statute is entitled to deference if it is a permissible construction of the language at issue, *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), the rationale supporting such deference must be kept in mind. Agencies are thought to be in a better position to interpret statutes governing subject matter in which they possess a particular expertise. *Id.* at 844. This rationale, however, does not support the argument that an agency's interpretation of a statutory provision implicating constitutional questions merits deference, for agencies are in no better position to resolve constitutional questions than the courts.* Therefore, while decisions of the STB regarding the preemptive effect of the ICC Termination Act may be persuasive, we are not bound by the Board's interpretation of that particular provision.

---

* The STB itself has noted:

> Many rail construction projects are outside of the Board's regulatory jurisdiction. For example, railroads do not require authority from the Board to build or expand facilities such as *truck transfer facilities*, weigh stations, or similar facilities *ancillary* to their railroad operations, or to upgrade an existing line or to construct unregulated spur or industrial team track. In such cases, we can provide advice about how preemption applies, but we have no direct involvement in the process.

*Borough of Riverdale*, S.T.B. Finance Docket No. 33466, 1999 WL 715272, at *4 (I.C.C.) (September 9, 1999) (emphasis added). Because the salt shed at issue in this appeal appears to be a truck transfer facility, arguably the STB's statements regarding preemption with respect to such facilities are mere "advice" entitled to little consideration relative to other authorities.

Nevertheless, the STB has noted generally with respect to § 10501(b):

> Preemption . . . does not withdraw from the states the "power to regulate where the activity regulated [is] a merely peripheral concern" of federal law. In other words, the ICCTA does not usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads. But the local law is preempted when the "challenged state statute 'stands as an obstacle to the accomplishment and execution to the full purposes and objectives of Congress.'"

*King County, WA*, S.T.B. Finance Docket No. 32974, 1996 WL 545598, at *4 (I.C.C.) (September 25, 1996) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243 (1959); *Perez v. Campbell*, 402 U.S. 637, 649 (1971)) (alteration in original); see also *Cities of Auburn & Kent, WA*, S.T.B. Finance Docket No. 33200, 1997 WL 362017, at *5 (I.C.C.) (July 1, 1997). Unfortunately, few courts have addressed the preemptive effect of the ICCTA, especially with respect to state and local regulation of a facility such as the salt shed at issue in this case, which is ancillary to the operations of the rail line.

One of the broader readings of the preemptive effect of the statute was made by the court in *City of Auburn v. United States Government*, 154 F.3d 1025 (9th Cir. 1998). In the context of the reacquisition of a portion of rail line in Washington from another railroad, the Burlington Northern and Santa Fe Railway sought to repair and improve the line through such measures as replacing track sidings, improving tunnels on the line and installing communication towers. *Id.* at 1028. The court determined that the STB had exclusive authority over the project, noting not only the preemption provision above, but also the provisions in the Act regarding the exclusive authority of the Board over merger or acquisition transactions involving rail carriers such as the acquisition underlying the Burlington Northern project. *Id.* at 1030 (citing 49 U.S.C. §§ 11321(a), 11323-11325). As a result, the court determined that local regulation of the project via an environmental permitting process was completely preempted. *Id.* at 1031; see also *Norfolk S. Ry. v. City of Austell, Georgia*, No. CIVA1:97-CV-1018-RLV, 1997 WL 1113647, at *8 (N.D. Ga. Aug. 18, 1997) (holding that city's zoning ordinance and land-use permitting requirement were completely preempted and did not prevent the construction, development and

operation of a facility used for the transport of cargo from rail carrier to motor carrier proposed for parcel of land owned by rail carrier). Notably, however, *City of Auburn* involved a *rail line* in contrast to the ancillary facility at issue in this case.

In a case more closely analogous to this one, the New Jersey Supreme Court noted, citing the STB, that the question of preemption of local regulations was necessarily a fact-bound determination. *Village of Ridgefield Park v. New York, Susquehanna & W. Ry.*, 750 A.2d 57, 63 (N.J. 2000) (citing *Borough of Riverdale*, S.T.B. Finance Docket No. 33466, 1999 WL 715272, at *8); see also *Jones v. Union Pac. R.R.*, 94 Cal. Rptr. 2d 661, 666-67 (Ct. App. 2000) (reversing summary judgment entered by trial court, noting that triable issues of fact existed with respect to the extent to which individuals' state claims for nuisance were preempted by the ICCTA and noting "[s]tate and local regulation of Union Pacific's trains is permissible if it does not interfere with Union Pacific's interstate rail operations. . . . if Union Pacific's activity in question did not further rail operations or was committed solely to harass plaintiffs, then plaintiffs' action is not federally preempted"). In *Village of Ridgefield Park*, the court determined with respect to the construction of a train maintenance facility used for such purposes as refueling and adding oil and coolant to trains that the municipality within which the facility was located could not have required the railroad to comply with the local permitting process prior to building the facility because of the delay it would occasion in the operation of the railway. 750 A.2d at 66. The rail carrier was instead obligated to simply notify the municipality of any further activity it was undertaking that would otherwise require a permit from another entity. *Id.* The facilities at issue were actually located primarily within several boxcars which had been placed on sidetracks added to the property by the railway. *Id.* at 59.

The court also concluded that the facility was still subject to "local fire, health, plumbing, safety and construction regulations" and that the carrier could not deny the village access to the facility for reasonable inspections of it. *Id.* at 66. Finally, the court held that the village could not condition the continued use of the facility on approval of the carrier's site plan for the facility, nor dictate via zoning regulation where the facility or future facilities could be located within the right-of-way held by the railroad for its rail line. *Id.* at 66-67. In making these determinations, the court rejected a lower court's reasoning that all state and local regulations with *any* economic impact on rail operations were preempted. *Id.* at 65.

■■ We likewise reject this argument advanced here by Vermont Railway. Nor do we agree with Vermont Railway's argument that *any* restriction on its activity at 207 Flynn Avenue *necessarily* has an economic impact on its railway operations such that it is preempted. As the trial court aptly noted, "mere ownership of a business enterprise by a railroad does not exempt that enterprise from all state or local regulation." Cf. *Florida East Coast Ry. v. City of West Palm Beach*, 110 F. Supp. 2d 1367, 1376-79 (S.D. Fla. 2000) (mere ownership of property by a railway on which lessee operated business which entailed unloading aggregate from railcars and distributing it did not result in preemption of local zoning regulation of the facility by the ICCTA; after examining nature of the operation, court concluded operation was not "integrally related" to provision of interstate rail service). Rather, the trial court adopted the proper approach of evaluating each of the conditions at issue to determine, based on the undisputed facts agreed upon by the parties, whether they stood as an obstacle to the goals of the ICCTA. See *King County, WA*, STB Finance Docket No. 32974, 1996 WL 545598, at *4.

■ Given the limited facts submitted to the trial court by the parties in support of their motions for summary judgment, we cannot say that the trial court erred when it determined that, with the exception of portions of four conditions, the requirements imposed on the salt shed operation by the City were not preempted by the ICCTA. It appears to have drawn the line between conditions that purported to regulate the operation of the railroad, including the transport of goods by the railway, and conditions that merely regulated activity regarding motor vehicles coming and going from the facility and the storage of materials at the facility.

Specifically, the trial court struck conditions limiting, directly or indirectly, the amount of salt that the railway may deliver to the facility. Accordingly, the court removed conditions that limited the total annual capacity of the salt shed to a certain amount of tonnage, that limited the hours during which salt could be delivered to the facility by rail, and that limited the total number of trucks that could pick up salt delivered by rail in the course of a snow season. Furthermore, the court amended the condition that required the railway to make its log book and other records generally available to the City to ensure compliance with other conditions. It made the condition more circumscribed to allow for the City to monitor compliance, but to also avoid a potential conflict with 49 U.S.C. § 11904, which, although making an exception for agents of a state,

prohibits disclosing information about the "nature, kind, quantity, destination, consignee, or routing of property tendered or delivered to that rail carrier for transportation." 49 U.S.C. § 11904(b). The City has not appealed the removal or amendment of these conditions and, therefore, we express no opinion as to the court's judgment in that regard.

We conclude, however, that the court properly left in place the remainder of the challenged conditions which control activities such as routing of trucks leaving the facility, the number of trucks exiting the facility on a daily basis pending the completion of the Champlain Parkway, the hours during which trucking can occur at the facility, parking at the facility, and conditions designed to avert potential contamination from the salt shed such as curbing requirements and requirements that salt be handled on impervious surfaces. These conditions do not interfere with *railway* operations; they merely address traffic issues and concerns with environmental contamination, matters properly within the province of municipalities by virtue of the state's delegation of its traditional police powers.

With respect to Vermont Railway's argument that all of the permit conditions are preempted by the Federal Railroad Safety Act, 49 U.S.C. §§ 20101-20153, the conditions do not attempt to regulate the subject matter of railroad safety nor does Vermont Railway point to any conditions that conflict with specific federal regulations regarding railway safety. 49 U.S.C. § 20106 (state may continue to regulate railroad safety until Secretary of Transportation prescribes a regulation or issues an order covering the same subject matter regulated and state may continue more stringent regulation regarding a local safety hazard if it is not incompatible with federal law and does not unreasonably burden interstate commerce); see also *Norfolk S. Ry. v. Shanklin*, 529 U.S. 344, 352, 120 S. Ct. 1467, 1473 (2000) (noting with regard to FRSA, "pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law") (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)) (internal quotation marks omitted; emphasis added). Therefore, the argument is without merit.

To the extent that Vermont Railway argues on appeal that the conditions imposed on the salt shed facility are unconstitutional, or more specifically violate the Commerce Clause, constitute a taking of property without just compensation, were imposed in violation of the railway's right to due process, and violate the railway's right to equal protection, these arguments were not raised before the trial court.

Therefore, Vermont Railway has failed to preserve these issues for appeal, and we will not address them. *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal.").

*Affirmed.*