**CFNR OPERATING COMPANY, INC. et al., Plaintiffs,**

v.

**CITY OF AMERICAN CANYON, et al., Defendants.**

**No. C–03–3424 BZ.**

United States District Court, N.D. California.

Sept. 4, 2003.

---

An H. Nguyen, B. Clyde Hutchinson, Linda C. Roodhouse, Lombardi Loper & Conant, LLP, Oakland, CA, for Plaintiffs.

Keith E. Johnson, Robert A. Goodin, Goodin, MacBride, Squeri, Ritchie & Day, LL, San Francisco, CA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ZIMMERMAN, United States Magistrate Judge.

Plaintiff Apex Bulk Commodities, a bulk transfer operator, subleases a portion of property located within defendant City of American Canyon[1] (the City) from plaintiff CFNR Operating Company, a common carrier that has lease rights from and operates on lines owned by Union Pacific Railroad Company.[2] Apex operates a bulk transfer facility on the property to transfer pumice and cement, which CFNR delivers to the property by rail, from railcars to Apex's trucks. Apex then delivers the materials to a local customer, Cultured Stone.

Concerned that Apex's operations posed possible environmental hazards, including dust, traffic and water run-off, and that Apex had not obtained a city business license or responded to prior citations based on violations of the Municipal Code, the City filed a state court action against Apex on April 22, 2002 seeking abatement of a public nuisance and compliance with the Municipal Code. On September 24, 2002, a superior court judge issued a preliminary injunction requiring Apex to "contain all materials which allow airborne debris to escape the property located at the terminus of Napa Junction Road," and "comply with all land use and business license regulations of the City." The City voluntarily dismissed the state court action on January 14, 2003.

Subsequently, Apex applied for a conditional land use permit, which was denied by the City Planning Commission. On July 17, 2003, the City Council adopted Resolution 2003–22, which affirmed the denial of Apex's application for a conditional land use permit for the subject property.[3] Apex continued its operations and on July 22, 2003, the City issued three citations to Apex for operating in violation of City law.

---

1. Plaintiff has sued the City of American Canyon as well as five City Council members. All defendants will be referred to as "the City."

2. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings including entry of final judgment pursuant to 28 U.S.C. § 636(c).

3. Resolution 2003–22 is directed at Apex and its application for a conditional land use permit. Plaintiff CFNR, who is not the subject of Resolution 2003–22, also seeks a preliminary injunction against enforcement of the Resolution.

The citations levied a fine of $100 per day, per violation. The fines could escalate to $500 per day, per violation.

On July 23, 2003, Apex and CFNR filed this action seeking declaratory and injunctive relief to prevent the City from regulating plaintiffs' operations and activities through Resolution 2003–22 on the grounds that the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. §§ 701, *et seq.*, 10101, *et seq.*, preempts the City's regulation. Plaintiffs also applied for a temporary restraining order. After a hearing, the parties resolved the issues that caused plaintiffs to seek that emergency order. Now before the Court is plaintiffs' motion for preliminary injunction to restrain the City from enforcing Resolution 2003–22 by issuing citations and fines pending a final determination of the underlying action or a transfer to the Surface Transportation Board for review.

■ Preliminarily, the City argues that the *Younger* abstention requires me to deny plaintiffs' motion. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (holding that absent extraordinary circumstances, federal courts may not enjoin or otherwise interfere with pending state judicial proceedings). Before the *Younger* abstention can be applied, three requirements must be met: (1) there must be ongoing state judicial proceedings at the time the federal action was filed; (2) the state judicial proceedings must implicate important state interests; and (3) the state judicial proceedings must afford the federal plaintiff an adequate opportunity to raise constitutional claims. *Id.; Green v. City of Tucson*, 255 F.3d 1086, 1091 (9th Cir.2001); *Beltran v. State of California*, 871 F.2d 777, 782 (9th Cir.1988). Because the first element is not satisfied in this case, abstention is not required.

■ The City voluntarily dismissed the state court proceedings in January 2003. The City's argument that issuance of the citations to Apex constitutes commencement of an administrative process that represents state judicial proceedings and requires abstention under *Younger* is not persuasive. Although the *Younger* doctrine can be applicable to administrative proceedings, (*see Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986)), neither Apex nor CFNR availed itself of the City's administrative review process following receipt of the citations. Mere issuance of the citations was not a judicial act and there is no pending proceeding that is adjudicative in nature relating to the citations. *See Agriesti v. MGM Grand Hotels, Inc.*, 53 F.3d 1000, 1001 (9th Cir.1995) (finding that issuance of misdemeanor citations was executive, not judicial in nature, and therefore did not mark the commencement of judicial proceedings for purposes of the *Younger* abstention). This case, like *Agriesti*, involves only a potential for future judicial proceedings.

■ Turning to plaintiffs' request, "[p]reliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor.... These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001) (citing *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir.2000)); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839–40

(9th Cir.2001); *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987).

■ On this record, plaintiffs have not established probable success on the merits or serious questions. Plaintiffs argue that the City's enforcement of the Resolution is improper because the ICCTA preempts local regulation of rail facilities. The preemption provision of the ICCTA is:

> (b) The jurisdiction of the [Surface Transportation] Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law.

49 U.S.C. § 10501(b); *see also City of Auburn v. United States Government,* 154 F.3d 1025, 1030 (9th Cir.1998) (finding that ICCTA preemption is not limited to economic regulation and upholding the Surface Transportation Board's finding that local environmental regulation of a railroad project aimed at repairing and reopening a rail line was preempted). This preemption language, however, does not reach local regulation of activities not integrally related to rail service. *See, e.g., Florida East Coast Railway Co. v. City of West Palm Beach,* 266 F.3d 1324 (11th Cir.2001) (holding in virtually identical circumstances that application of local zoning and occupational license ordinances against a company leasing property from a railroad does not constitute "regulation of rail transportation" and is not preempted by the ICCTA); *Flynn v. Burlington Northern Santa Fe Corporation,* 98 F.Supp.2d 1186, 1189–90 (E.D.Wash.2000) (noting that "ancillary railroad operations" such as "truck transfer facilities" are not subject to federal preemption) (citing *Borough of Riverdale—Petition for Declaratory Order— The New York Susquehanna & Western Railway Corp.,* 1999 WL 715272, STB Finance Docket No. 33466 at 10 (9/9/99)); *In re Appeal of Vermont Railway,* 171 Vt. 496, 769 A.2d 648, 654–55 (2001) (finding that local zoning regulations of railroad's salt shed operation were not preempted to the extent that they concerned traffic issues and potential environmental contamination).

Without ruling on the merits, it appears that the City's Resolution is aimed not at CFNR or at rail operations, but is focused on Apex's non-railroad business activities on the property. The Resolution is in the nature of a generally applicable exercise of the City's police powers to safeguard the health and safety of its citizens. *See Flynn,* 98 F.Supp.2d 1186, 1189. The City simply denied Apex's conditional use permit to run its bulk materials transfer facility because of the problems it had experienced with Apex, and did not prevent anyone from running a rail operation or otherwise interfere with or attempt to regulate rail operations.

In fact, Apex does not appear to be involved in activities integrally related to rail transportation at the subject property. At the hearing, plaintiffs argued that because Apex hauls goods from its facility at the railroad terminal to the customer who ordered the goods, it completes the process of transporting goods by rail and so is subject only to ICCTA regulation. Taken

to its logical conclusion, plaintiffs' argument would mean that any trucking company who picks up goods from a railroad terminal for delivery to a customer would be free from local regulation. Congress, however, could not have intended such an expansive interpretation of the ICCTA's reach. *See, e.g., Florida East Coast Railway Co.*, 266 F.3d at 1328–31.

Nor does CFNR claim that it cannot continue to use the rail tracks. It can even continue to deliver to Apex so long as Apex complies with the City's regulations. There is no claim that the City is trying to prevent CFNR from transporting the cement and pumice to American Canyon. Further, there does not appear to be a business relationship between Apex and CFNR beyond the fact that Apex subleases property from CFNR.

Apex urges reliance on *Union Stock Yard & Transit Co. of Chicago v. United States*, 308 U.S. 213, 60 S.Ct. 193, 84 L.Ed. 198 (1939) to find that its operations, consisting of unloading materials from rail cars and loading trucks, are common carrier activities that fall within the authority of the ICCTA. *Union Stock Yard*, however, is neither dispositive nor factually on point. That case involved the Interstate Commerce Commission's (ICC) effort to regulate a common carrier that shipped livestock. The carrier tried to avoid ICC rate regulation of the loading and unloading of the livestock by transferring those services and facilities to one company and the operation of the railroad to another. That case did not involve preemption of state or local regulations and was decided prior to the ICCTA, which "changed significantly" the pre-ICCTA regulatory scheme. *See Flynn*, 98 F.Supp.2d at 1188. Moreover, Apex is not a common carrier subject to the ICC, like the railroad in *Union Stock Yard*.

■ Even if plaintiffs had shown a probability of success on the merits, they have not persuaded me of the possibility of irreparable harm. To the extent that the claimed harm is economic, including the potential loss of revenues and the present contract, and the escalating fines imposed by the citations, damages would appear to be an adequate remedy. Claims about future contracts are speculative. Both Apex and CFNR claim that enforcement of Resolution 2003–22 "may cause" detrimental job consequences to seventeen Apex employees and forty CFNR employees. These claims of job losses are speculative and so do not rise to the level of irreparable harm. Apex and CFNR also claim that their business relationships with each other and with Cultured Stone are built on goodwill and will be adversely affected, but this alleged harm appears to be the same as the potential harm from lost contracts and revenues, which does not constitute irreparable injury. Plaintiffs do not contend that they will lose potential customers or that there will be any effect on other ongoing efforts to obtain business. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir.2001); *Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 602–03 (9th Cir.1991).

■ In addition, the balance of the hardships does not tip sharply in plaintiffs' favor. No certain adverse employment consequences have been shown that would result from denial of the preliminary injunction. Although plaintiffs contend that denial of the injunction will interfere with their relationship with each other and with Cultured Stone, nothing on the record establishes that the citations require Apex or CFNR to shut down their businesses entirely. Conversely, issuance of a preliminary injunction would certainly prevent the City from enforcing its Municipal Code and the Resolution, which appear to reflect the interests of public health and safety.

 Nor does the public interest aspect of this case weigh in favor of issuing a preliminary injunction. Plaintiffs rely on speculative job losses and loss of revenue, and therefore taxes, in arguing that the public interest would be adversely affected by this preliminary injunction. They also note that a third company, Cultured Stone, would be affected by this injunction. According to Cultured Stone, denying a preliminary injunction might result in detrimental job consequences for 615 employees working there if it is forced to transfer production to out-of-state manufacturing facilities based on Apex's inability to provide Cultured Stone with raw materials. While I am sensitive to potential job losses and loss of revenue, I am mindful of the fact that Cultured Stone does not claim that it cannot again acquire pumice and cement as it did for over 10 years before doing business with plaintiffs. I am also mindful of the opposing public interests such as the health and safety of the City's residents and the ability of the City to protect those residents by enforcement of municipal regulations.

Accordingly, it is **HEREBY ORDERED** that plaintiffs' motion for preliminary injunction is **DENIED. IT IS FURTHER ORDERED** that by September 15, 2003, plaintiffs shall advise the court whether they wish an early trial date (the week of November 17, 2003 is available) or an early date for hearing cross motions for summary judgment (November 19, 2003, is available).