**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NORFOLK SOUTHERN RAILWAY
COMPANY,

> *Plaintiff-Appellee,*

v.

CITY OF ALEXANDRIA, a municipal
corporation organized under the
laws of the Commonwealth of
Virginia; RICHARD BAIER, in his
official capacity as Director of
Transportation and Environmental
Services for the City of
Alexandria,

> *Defendants-Appellants,*

v.

RSI LEASING, INCORPORATED,

> *Third Party Defendant-Appellee.*

No. 09-1566

NORFOLK SOUTHERN RAILWAY
COMPANY,

                    *Plaintiff-Appellant,*

                    v.

CITY OF ALEXANDRIA, a municipal
corporation organized under the
laws of the Commonwealth of
Virginia; RICHARD BAIER, in his
official capacity as Director of
Transportation and Environmental
Services for the City of
Alexandria,

                    *Defendants-Appellees,*

                    v.

RSI LEASING, INCORPORATED,

     *Third Party Defendant-Appellant.*

No. 09-1608

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:08-cv-00618-JCC-TRJ)

Argued: March 24, 2010

Decided: June 16, 2010

Before KING and GREGORY, Circuit Judges, and
Joseph R. GOODWIN, Chief United States District Judge
for the Southern District of West Virginia,
sitting by designation.

Affirmed in part, dismissed in part, and vacated in part by published opinion. Judge King wrote the opinion, in which Judge Gregory joined. Judge Goodwin wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: William Eric Pilsk, KAPLAN KIRSCH & ROCKWELL, LLP, Washington, D.C., for Appellants/Cross-Appellees. Gary Alvin Bryant, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Charles A. Spitulnik, Lisa Reynolds, KAPLAN KIRSCH & ROCKWELL, LLP, Washington, D.C.; James L. Banks, Christopher P. Spera, OFFICE OF THE CITY ATTORNEY, Alexandria, Virginia, for Appellants/Cross-Appellees.

## OPINION

KING, Circuit Judge:

These appeals concern whether three separate provisions of federal law serve to preempt an ordinance enacted by the City of Alexandria, Virginia (the "City"). The City's ordinance has been applied to Norfolk Southern Railway Company ("Norfolk Southern") through a series of haul permits. In its appeal, the City maintains that the district court erred in ruling that two federal statutes — the Interstate Commerce Commission Termination Act (the "ICCTA") and the Hazardous Materials Transportation Act (the "HMTA") — preempt the ordinance and haul permits. *See Norfolk S. Ry. Co. v. City of Alexandria*, No. 1:08-cv-618 (E.D. Va. April 15, 2009) (the "District Court Opinion").[1] By cross-appeal, Norfolk Southern

---

[1]The District Court Opinion is found at J.A. 97-136. (Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.)

challenges the court's conclusion that a third statute, the Federal Rail Safety Act (the "FRSA"), does not also preempt the ordinance and permits.

As explained below, we affirm the district court's decision on preemption with respect to the ICCTA. Because that disposition renders moot the alternative bases for federal preemption, we dismiss the HMTA aspect of the City's appeal, as well as the cross-appeal. Finally, we vacate the court's judgment on the HMTA and FRSA preemption claims.

I.

A.

In April 2008, Norfolk Southern began operating an ethanol transloading facility (the "Facility") in Alexandria, Virginia. The Facility enables Norfolk Southern to transfer bulk shipments of ethanol from its railcars onto surface tank trucks that are operated by third parties. Shippers contract with Norfolk Southern to have ethanol shipped to the Facility by rail, and Norfolk Southern includes the expense of transloading in its overall price for transporting ethanol. Norfolk Southern's agent, RSI Leasing, Incorporated ("RSI"), performs the transloading operations at the Facility.[2] All further arrangements regarding the transportation of ethanol from the Facility by truck, however, are made between the ethanol shippers and receivers and the private trucking companies. The tank trucks loaded at the Facility transport ethanol via the City's streets to nearby interstate highways and en route to their ultimate destinations.

The Facility is located in the City near two residential neighborhoods, an elementary school, the Van Dorn Metro Station and associated commuter parking lot, and other popu-

---

[2]RSI is also a party to the cross-appeal. For ease of reference, we primarily refer to the two cross-appellants simply as "Norfolk Southern."

lated areas. Because ethanol is highly flammable and volatile, the City took at least two steps in June 2008 to alleviate perceived safety concerns. First, the City petitioned the Surface Transportation Board (the "STB"), an independent federal agency, for a declaration regarding the City's authority to regulate the Facility. Second, pursuant to an ordinance prohibiting the hauling of certain materials on its streets, the City unilaterally issued a thirty-day haul permit to Norfolk Southern (the "Permit").[3] Norfolk Southern declined to abide by any aspect of the Permit, taking the position that it was facially inapplicable to the Facility, and, in any event, was preempted by federal law.

---

[3]The Permit imposed several conditions, including limiting what could be hauled, specifying a hauling route through the City, and restricting the days and times for such hauling. More specifically, the Permit provided:

1) No dirt, mud or debris shall be tracked/spilled onto the public right-of-way.

2) A copy of this permit must be provided each driver. Failure to follow routing will result in revocation of this permit. No entering the city before 7:00 a.m. No jake brakes or engine braking within the city limits. Driver shall obey all traffic signs and markings.

3) Hauling route is from the Alexandria facility to Metro Road, Metro Road to Eisenhower Avenue, west on Eisenhower Avenue to Van Dorn Street, south on Van Dorn Street and out of the city limits.

   Hauling is permitted Monday through Friday, 7:00 a.m. to 7:00 p.m. only.

   Hauling is limited to a maximum of 20 trucks per day.

4) This permit is being issued despite city concerns and objections to Norfolk Southern and its contractors relating to the appropriateness of ethanol transloading at this location.

5) This permit will be revoked should this operation be halted by any governing authority.

J.A. 198. During the relevant period, the City sought to reissue the Permit every thirty days. For the sake of simplicity, we refer to the various permits in the singular, as the "Permit," despite the fact that such permits were recurrently issued.

In response, on June 14, 2008, the City amended its original ordinance to explicitly govern the transportation within the City of "bulk materials," including ethanol. City Code of Alexandria § 5-2-27(a) (as amended, the "Ordinance").[4] A violation of the Ordinance constitutes a misdemeanor criminal offense. Pursuant to the Ordinance, the City, on July 3, 2008, unilaterally issued a second thirty-day Permit to Norfolk Southern. This Permit, and those issued thereafter, contained the same restrictions as the original Permit. Norfolk Southern, however, adhered to its position that federal law preempted the City's effort to regulate ethanol transloading at the Facility and thus refused to abide by the Permit's restrictions.

B.

On June 16, 2008, Norfolk Southern filed this declaratory judgment action in the Eastern District of Virginia against the City and Richard Baier of the City's Department of Transportation and Environmental Services.[5] In three counts of its complaint, Norfolk Southern alleged that the Ordinance, as applied through the Permit, was preempted by three separate federal statutes, the FRSA (Count Three), the ICCTA (Count Four), and the HMTA (Count Five).[6] For relief, Norfolk Southern sought a declaration that the Ordinance and Permit were preempted and an injunction barring the City from enforcing them.

---

[4]The Ordinance, as amended, provides in pertinent part that "[h]auling . . . bulk materials . . . is prohibited on all streets within the City, except pursuant to a permit issued [by the City]." Ordinance § 5-2-27(a).

[5]Baier and the City are collectively referred to herein as the "City."

[6]In addition to its three preemption claims, the complaint alleged that the original ordinance was inapplicable to ethanol hauling (Count One) and was void for vagueness (Count Two). After concluding that the claims in these first two counts were moot, the district court awarded summary judgment to the City on them. Norfolk Southern does not appeal that ruling.

On June 25, 2008, the City filed its answer to the complaint, a third-party complaint against RSI, and a counterclaim against Norfolk Southern. The third-party complaint and counterclaim sought declaratory and injunctive relief against both Norfolk Southern and RSI. In support thereof, the City alleged that

> [b]ecause [Norfolk Southern] and RSI intend to increase the volume of ethanol transloading operations to a 24-hour a day, 7-day a week basis, and to use many more trucks than the permit allows, there is an actual controversy between the parties regarding the authority of the City to regulate the use of City streets by ethanol-filled trucks from the Van Dorn Yard.

J.A. 81. Following discovery, the parties filed cross-motions for summary judgment, seeking relief as a matter of law.

Before the district court ruled on the cross-motions, the STB issued its decision on the City's petition for an administrative declaration concerning the City's authority to regulate the Facility. Notably, the STB concluded that Norfolk Southern's operation thereof "constitutes transportation by rail carrier" and thus is "shielded from most state and local laws, including zoning laws, by the preemption provision [of the ICCTA]." City of Alexandria, Virginia — Petition for Declaratory Order, Finance Docket No. 35157 at 1 (S.T.B. Feb. 17, 2009) (the "STB Decision").[7] The STB Decision explained that "the Facility is part of [Norfolk Southern]'s rail operations" and, as such, "the Facility qualifies for federal preemption." *Id.* at 3.

Two months after the STB Decision, the district court ruled on the parties' cross-motions for summary judgment. In pertinent part, the court concluded that the Ordinance was pre-

---

[7]The STB Decision is found at J.A. 443-49.

empted under both the ICCTA and the HMTA. *See* District Court Opinion 18-37. Additionally, however, the court ruled that the Ordinance was not preempted under the FRSA. *See id.* at 11-18. The City appeals from the award of partial summary judgment to Norfolk Southern, maintaining that the Ordinance is not preempted by either the ICCTA or the HMTA. Norfolk Southern and RSI have cross-appealed, contending that the Ordinance is also preempted under the FRSA. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). On cross-motions for summary judgment, a district court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

## III.

Our resolution of these appeals implicates two important principles of constitutional law. First, the doctrine of preemption — rooted in the Constitution's Supremacy Clause — permits Congress to expressly displace state or local law in any given field. *See Worm v. Am. Cyanamid Co.*, 970 F.2d 1301, 1304 (4th Cir. 1992) ("Congress may expressly provide that federal law supplants state authority in a particular field . . . .").[8] Second, the principle of constitutional avoidance set

---

[8]The Supremacy Clause provides that the Constitution and laws of the United States are "the supreme Law of the Land . . . any Thing in the Con-

forth in *Ashwander v. Tennessee Valley Authority* requires the federal courts to strive to avoid rendering constitutional rulings unless absolutely necessary. *See* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the Court to decide questions of a Constitutional nature unless absolutely necessary to a decision of the case." (internal quotation marks omitted)).

Although the district court addressed and ruled upon each of Norfolk Southern's alternative statutory bases for preemption, our resolution of these appeals may rest on only one of those bases if it satisfies the legal standards for preemption. *See Catawba Indian Tribe of S.C. v. City of Rock Hill*, 501 F.3d 368, 372 n.4 (4th Cir. 2007) ("We are . . . entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below."). And, as explained herein, we are content to affirm the court's ruling that the Ordinance, as applied to Norfolk Southern through the Permit, is preempted by the ICCTA. Because our disposition of the ICCTA claim renders moot Norfolk Southern's other preemption claims, we need not reach or address the HMTA preemption aspect of the City's appeal or the FRSA preemption issue presented by Norfolk Southern's cross-appeal. We therefore dismiss the HMTA and FRSA aspects of these appeals and vacate the court's judgment on those two claims.

A.

In 1887, the Interstate Commerce Act created the Interstate Commerce Commission (the "ICC"), which regulated rail transportation for 122 years. In 1995, Congress enacted the

stitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. For purposes of the Supremacy Clause, "the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

ICCTA, which terminated the ICC and replaced it with the STB, which has "broad jurisdiction over 'transportation by rail carriers.'" *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009) (quoting 49 U.S.C. § 10501(b)(1)). Indeed, the STB has exclusive jurisdiction over "(1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of . . . tracks, or facilities." 49 U.S.C. § 10501(b). "Transportation" by rail carriers includes, in relevant part,

> (A) [a] facility . . . related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, . . . storage, handling, and interchange of property.

*Id.* § 10102(9). The ICCTA also contains an express preemption clause: "the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law." *Id.* § 10501(b).

Our Court has heretofore recognized that Congress has "'narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation.'" *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2009)). By contrast, the ICCTA does not preempt those state or local laws that have a more remote or incidental impact on rail transportation. *See id.* Moreover, state and local governments may act, pursuant to their general police powers, to regulate certain areas affecting railroad activity; for example, local electric, building, fire, and plumbing codes are generally

not preempted. *See Green Mtn. R.R. Corp. v. Vermont*, 404
F.3d 638, 643 (2d Cir. 2005).

1.

In assessing this matter, we first consider whether the Ordinance, as applied through the Permit, regulates "transportation by a rail carrier," as defined by the ICCTA. Any such regulation is preempted unless it can be classified as a permissible exercise of the City's police powers. Although the parties agree that ethanol transloading falls within the ICCTA's preemptive scope, they disagree on whether the Ordinance and Permit directly regulate the Facility and its transloading operations.

It is well established that a state or local law that permits a non-federal entity to restrict or prohibit the operations of a rail carrier is preempted under the ICCTA. *See, e.g.*, *Green Mtn.*, 404 F.3d at 643 (concluding that ICCTA preempted state environmental law that "unduly interfere[d] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations" (internal quotation marks omitted)); *Vill. of Ridgefield Park v. N.Y. Susquehanna & W. Ry. Corp.*, 750 A.2d 57, 64 (N.J. 2000) (holding that state and local regulation "must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce" (internal quotation marks omitted)).[9]

---

[9]The STB has heretofore concluded that local regulation interfering with railroad operations is preempted by the ICCTA. *See, e.g.*, Borough of Riverdale — Petition for Declaratory Order, Finance Docket No. 33466 at 8 (S.T.B. Sept. 10, 1999) (concluding that local regulations imposing "a local permitting . . . process as a prerequisite to the railroad's [use] of its facilities are preempted because they would, of necessity, impinge upon the federal regulation of interstate commerce").

Norfolk Southern maintains that, "by asserting the power to determine if, when, and under what conditions trucks may enter or leave the Facility, the City's actions do directly regulate the Facility." Br. of Appellees 17. The district court likewise concluded that "the Ordinance affords the City nearly unlimited discretion regarding when and under what conditions to grant permits. . . . '[T]he railroad is restrained from [its activities] until a permit is issued . . . .'" District Court Opinion 27 (quoting *Green Mtn.*, 404 F.3d at 643).

Put simply, we agree with the district court that the Ordinance and Permit regulate ethanol transloading at the Facility. The Ordinance authorizes the City to impose any "conditions and restrictions, as the director [of transportation] may deem appropriate to promote traffic safety." Ordinance § 5-2-27(b). This open-ended provision grants the City unlimited control over the Facility and its transloading. Moreover, the record reveals the substantial practical implications of the City's enforcement actions. In his deposition, a Norfolk Southern trainmaster explained the common-sense proposition that

> limiting the number of trucks that leave [the Facility] directly affects how many railcars can be unloaded . . . . [I]t would just be a short amount of time before my tracks would be full . . . and I wouldn't be able to switch the traffic for my other customers and service my other customers as required.

J.A. 292. Another Norfolk Southern employee observed that the backlog in rail traffic caused by the restrictions specified in the Permit would adversely affect the "continuous movement of freight through our yards." *Id.* at 276. Moreover, this effect "could ripple elsewhere through the [Norfolk Southern] rail system." *Id.* at 258.

The City asserts that the Permit regulates only the trucks leaving the Facility, not the transloading process itself, and that "delivery, and therefore transportation, is complete upon

transloading." Br. of Appellants 25. According to the City, the Permit "do[es] not regulate any aspect of the movement of trains, the unloading or transloading of trains, the time of day during which transloading can occur, or the number of trucks that can be filled with ethanol in any day." *Id.* Although the City relies on several decisions for its legal position here, none of those authorities actually support the City's position in this appeal. *See Fla. E. Coast Ry.*, 266 F.3d at 1328; *CFNR Operating Co. v. City of Am. Canyon*, 282 F. Supp. 2d 1114 (N.D. Cal. 2003); *In re Vt. Ry.*, 769 A.2d 648 (Vt. 2000).

For example, in *Florida East Coast Railway*, a permittee's use of a railyard was not activity within the ICCTA's preemptive scope because the yard "serve[d] no public function and provide[d] no valuable service to" the railroad, as it only involved the permittee's "operation of a private distribution facility" on railroad-owned land. *See* 266 F.3d at 1336. The Eleventh Circuit held that

> existing zoning ordinances of general applicability, which are enforced against a private entity leasing property from a railroad for non-rail transportation purposes, are not sufficiently linked to rules governing the operation of the railroad so as to constitute laws "with respect to regulation of rail transportation."

*Id.* at 1331. The dispute in that case involved the application of local laws to a receiver's business that happened to be on railroad property. In this dispute, however, the Ordinance and Permit directly impact Norfolk Southern's ability to move goods shipped by rail. In fact, the Eleventh Circuit carefully distinguished its decision from the situation presented here, where the local permitting requirements "unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct

operations." *Id.* at 1331 n.5 (emphasis and internal quotation marks omitted).**¹⁰**

In the dispute between the City and Norfolk Southern, by contrast, the Ordinance and Permit necessarily regulate the transloading operations of Norfolk Southern at the Facility. Thus, the City has regulated "transportation by a rail carrier," as defined by the ICCTA.**¹¹**

2.

Next, the City asserts that, even if the Permit and Ordinance regulate "transportation by a rail carrier," it was yet entitled to issue the Permit pursuant to its police powers. In order for a state or local regulation to be a proper exercise of police power in such a context, the regulation must not (1) discriminate against rail carriers or (2) unreasonably burden rail carriage. *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) (citing *Green Mtn.*, 404

---

**¹⁰**The other authorities relied on by the City are likewise inapposite. *See Vt. Ry.*, 769 A.2d at 653-55 (concluding that ICCTA did not preempt local laws that regulated activity — a railroad's operation of a salt distributorship — "ancillary to the operations of the rail line" that did not have "an economic impact on [the railroad's] operations"); *CFNR Operating Co.*, 282 F. Supp. 2d at 1118 (concluding that ICCTA did not preempt regulation that did not "prevent anyone from running a rail operation or otherwise interfere with or attempt to regulate rail operations").

**¹¹**The City also maintains that the Ordinance and Permit do not regulate a "rail carrier," as the City contends that it has sought to regulate only those trucks travelling to and from the Facility. This contention is also without merit. As explained above, the activities regulated by the Ordinance and Permit are, as recognized by the STB, "an integral part of [the railroad's] provision of transportation by rail carrier." Hi Tech Transp., LLC — Petition for Declaratory Order, Finance Docket No. 34192 at 7 (S.T.B. Aug. 14, 2003). Indeed, considering the precise Facility at issue in this appeal, the STB Decision concluded that "transloading is bundled with the transportation services that [Norfolk Southern] provides to ethanol shippers." STB Decision 4. As a result, the transloading operations at the Facility are conducted by a "rail carrier," as defined by the ICCTA.

F.3d at 643). The Second Circuit's *Green Mountain* decision further explains that local regulations are not preempted "at least to the extent that [they] protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions." 404 F.3d at 643.

Although the Ordinance and Permit commendably seek to enhance public safety, they unreasonably burden rail carriage and thus cannot escape ICCTA preemption under the police power exception. Several courts have recognized that requiring a rail carrier to obtain a locally issued permit before conducting rail operations — generally referred to as "permitting" or "preclearance" requirements — will impose an unreasonable burden on rail transportation. *See, e.g.*, *Green Mtn.*, 404 F.3d at 643; *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030-31 (9th Cir. 1998). Here, for example, the City has the power to halt or significantly diminish the transloading operations at the Facility by declining to issue haul permits or by increasing the restrictions specified therein. As a result, the Ordinance entails "extended or open-ended delays" based on the City's issuance of the Permit, and issuance of the Permit necessarily requires "the exercise of discretion" by the City. *Green Mtn.*, 404 F.3d at 643. The Ordinance and Permit are thus preempted, notwithstanding the police powers possessed by the City. Accordingly, the Ordinance and Permit, as applied to Norfolk Southern, are preempted under the ICCTA.[12]

---

[12]The City also seeks to forestall the application of preemption by relying on a legal presumption against federal preemption. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The history of federal regulation of railroad operations and the effect of the Ordinance and Permit on such operations, however, plainly render this argument meritless. *See United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."); *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 46 (1st Cir. 2008) ("Historically, federal regulation of railroads has been extensive . . . ."). The City seeks

B.

As a separate aspect of its appeal, the City asks that we reverse the district court's ruling that the HMTA provides an alternative basis for preemption. And through its cross-appeal, Norfolk Southern asks us to reverse the court's ruling that the Ordinance was not preempted by the FRSA. We are constrained to decline both invitations. Our decision on the ICCTA issue — that federal law preempts the Ordinance from being applied to Norfolk Southern through the Permit — moots the HMTA and FRSA issues pursued here.

We are always obliged to assure ourselves that a live dispute exists between the parties at all stages of litigation. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). A dispute is moot when "the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal quotation marks omitted). And the parties lack such an interest when, for example, our resolution of an issue could not possibly have any practical effect on the outcome of the matter. *See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehabilitative Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000) ("When events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief, the case is moot and must be dismissed."). Thus, although the parties may desire that we "render an opinion to satisfy their demand for vindication or curiosity about who's in the right and who's in the wrong," we may only "decide cases that matter in the real world." *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1250 (10th

to avoid this principle by once again asserting that the Ordinance applies only to "truck traffic on city streets." Br. of Appellants 12. As explained above, we reject that characterization because the Ordinance, as applied through the Permit, regulates much more than the local transportation of ethanol by truck.

Cir. 2009) ("[O]ur . . . inability to render judgment on nice hypothetical or advisory questions . . . distinguishes the role of the federal judge from that of the advisor or academic in our constitutional order.").

The foregoing principles are controlling with respect to the HMTA and FRSA issues. Any ruling by us on Norfolk Southern's alternative bases for preemption under the HMTA or the FRSA could not have any practical effect on the outcome of this case. Whether those statutes preempt the Ordinance and Permit would have no impact on our disposition of this matter, namely, that the Ordinance and Permit are preempted by the ICCTA. Thus, were we to pass on the HMTA and FRSA bases for preemption, we could offer nothing more than an advisory opinion on potentially difficult questions of federalism and constitutional law. *See Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) ("To decide a moot issue is to issue an advisory opinion . . . ."); *see also Bell Atl. Md., Inc. v. Prince George's County*, 212 F.3d 863, 865 (4th Cir. 2000) (discussing constitutional nature of preemption analysis). The *Ashwander* doctrine of constitutional avoidance — which applies with equal force to preemption claims — cautions against any such endeavor. *See Columbia Venture, LLC v. Dewberry & Davis, LLC*, __ F.3d __, No. 08-1318, slip op. at 5-6 (4th Cir. May 12, 2010) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341-47 (1936) (Brandeis, J., concurring)). Accordingly, we will not blithely tread into other complex issues when our disposition of the ICCTA claim definitively resolves this matter.

The customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment. *See Alvarez v. Smith*, 130 S. Ct. 576, 581 (2009) (explaining that courts "normally . . . vacate the lower court judgment in a moot case because doing so clears the path for future relitigation of the issues between the parties" (internal quotation marks omitted)); *see also Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) ("If a claim becomes moot after

the entry of a district court's final judgment and prior to the completion of appellate review, we generally vacate the judgment . . . ."). The established practice of vacatur is warranted, however, "only where mootness has occurred through happenstance, rather than through the voluntary action of the losing party." *Mellen*, 327 F.3d at 364. Although vacatur is not warranted when a case has been rendered moot by settlement, "a party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortgage Co. v. Bonner Mall P'Ship*, 513 U.S. 18, 25 (1994).

In these circumstances, we are satisfied that vacatur of the district court's judgment on the HMTA and FRSA preemption counts is warranted. Addressing those issues would simply result in an advisory opinion being rendered on moot issues. Furthermore, the City's appeal of the HMTA preemption ruling and Norfolk Southern's cross-appeal of the FRSA preemption ruling were rendered moot not by virtue of any voluntary action of either party, but instead by the vagaries of circumstance. In short, the parties are denied appellate review of those adverse determinations as a result of our decision on the ICCTA preemption issue and not because of some unilateral action on their part, such as settlement.[13] Thus, there is no

---

[13]We sincerely appreciate the thoughtful views expressed by our distinguished colleague in his fine separate opinion, and particularly thank him for his concurrence in the preemption aspect of this opinion. We also essentially agree on the mootness question. *See post* at 19 ("[O]ur decision on the ICCTA issue effectively moots the HMTA and FRSA issues."). It appears that our sole difference is a narrow one, which may well be of greater interest to the academic community than to everyday litigants: whether an explicit vacatur of the HMTA and FRSA judgments is warranted, or whether the implicit vacatur advocated by the partial dissent sufficiently protects the interests of the parties and the judicial system. As explained above, we see an explicit vacatur ruling as essential, primarily because application of the constitutional avoidance doctrine has denied Norfolk Southern and the City their rights of appeal, pursuant to 28 U.S.C. § 1291, of the district court's judgment on the HMTA and FRSA preemption claims.

reason to deviate from our customary practice of vacating the lower court's judgment as to moot claims.

## IV.

Pursuant to the foregoing, we affirm the district court's judgment on the ICCTA preemption issue, dismiss the balance of these appeals as moot, and vacate the judgment as to the HMTA and FRSA preemption issues.

> *AFFIRMED IN PART,*
> *DISMISSED IN PART,*
> *AND VACATED IN PART*

GOODWIN, Chief District Judge, concurring in part and dissenting in part:

I join the majority in affirming the district court's ruling on the ICCTA issue, but respectfully disagree with its decision to vacate the district court's rulings on the HMTA and FRSA issues. Rather than vacating those rulings, I would affirm the district court's judgment on the ICCTA issue, dismiss the City's appeal of the court's HMTA ruling, and dismiss Norfolk Southern's cross-appeal of the FRSA ruling.

By their appeals, the parties ask us to address the district court's rulings on whether the Ordinance is preempted by HMTA and FRSA. I agree with the majority that we should decline this invitation, because our decision on the ICCTA issue effectively moots the HMTA and FRSA issues. *See Air Line Pilots Assn., Int'l v. UAL Corp.*, 897 F.2d 1394, 1396-97 (7th Cir. 1990).

Nevertheless, the HMTA and FRSA issues are not "moot" in the traditional, Article III sense of that word. That is, we continue to possess jurisdiction to review them, but may decline to do so out of prudential concerns. As the Seventh Circuit has explained, there is both a conceptual and a practi-

cal reason for this: "The conceptual reason is that it is cases rather than reasons that become moot. Whether a court gives one or ten grounds for its result is not a question to which Article III prescribes an answer. The practical reason is that the alternative grounds are ripe for decision and deciding them may help a higher or a subsequent court." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 924-25 (1984); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533 (2d ed. 1984)).

Therefore, while we could decide these issues within the confines of Article III, doing so in this case would be inappropriate. As the majority points out, federal courts have long adhered to the constitutional avoidance doctrine. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885))). This admonition is particularly apt in the preemption context, where federalism issues are at the forefront.

But the majority takes the unnecessary step of vacating the HMTA and FRSA aspects of the district court decision — what the Supreme Court has termed an "extraordinary remedy." *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). The majority bases its decision to vacate on its belief that "[t]he customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment." *Ante* at 17-18 (citing *Alvarez v. Smith*, 130 S. Ct. 576, 581 (2009), and *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003)). Upon closer inspection, however, the cases relied upon by the majority are materially distinguishable from this case.

In both *Alvarez* and *Mellen*, the issues on appeal became moot before they were presented to the appellate court. For

instance, in *Alvarez* the petitioner sued state officials for unlawfully seizing his property. After the court of appeals rendered a judgment, but before oral argument in the Supreme Court, the state returned the petitioner's property. Because this left no Article III case or controversy, the Court held that it lacked jurisdiction over the dispute, vacated the lower-court decision, and remanded with instructions to dismiss. *Alvarez*, 130 S. Ct. at 583. And in *Mellen*, cadets at the Virginia Military Institute sought declaratory and injunctive relief against the VMI superintendant for violating their religious freedoms. After the district court judgment, but before the case was argued on appeal, the plaintiff-cadets graduated. Judge King explained that "[i]f a claim becomes moot after the entry of a district court's final judgment and prior to the completion of appellate review, we generally vacate the judgment and remand for dismissal." *Mellen*, 327 F.3d at 364. Thus, the panel vacated the district court judgment and dismissed the case.

In those situations, I agree that vacatur was appropriate. Something happened *factually* — prior to an appellate decision — that mooted the issues on appeal, depriving the appellate court of Article III jurisdiction. Because the cases became moot before they could be reviewed on appeal, the lower-court judgment was essentially unreviewable.

Here, however, it is our decision on the ICCTA issue, rather than any underlying change in the facts, that has "mooted" the HMTA and FRSA issues. Unlike the moot issues in *Alvarez* and *Mellen*, those issues are not insulated from appellate review because of a lack of federal jurisdiction. Rather, for prudential reasons, we are declining to address them.

A similar situation was presented in *United States v. Manning*, 527 F.3d 828 (9th Cir. 2008). In that case, the United States challenged a Washington state environmental statute. The district court invalidated the state statute on several

grounds. The district court ruled that it was preempted by federal law, and that it contravened federal sovereign immunity, the Commerce Clause, and the Contract Clause. The State of Washington appealed each of these rulings. The court of appeals affirmed the district court's decision on the preemption issue. Having identified one ground on which to affirm the district court's judgment, the court declined to address the State's other challenges. In a footnote, the court explained, "Because the CPA is invalid under the Supremacy Clause, we do not need to reach the additional constitutional challenges. Although we do not reach the issue of sovereign immunity or the challenges under the Commerce Clause and the Contract Clause, we decline to vacate those portions of the district court's order as the State requests. Rather, we simply express no view on issues unnecessary to this opinion." *Manning*, 527 F.3d at 837 n.8.

I would follow *Manning*'s lead in this case. We have chosen not to address the district court's HMTA and FRSA rulings out of prudential concerns. Because we have chosen not to address those issues, the only point of law from the district court opinion with any preclusive effect is its ICCTA ruling. *See Restatement (Second) of Judgments* § 27 cmt. O (1982) ("If the judgment of the [trial] court . . . was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and . . . . the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination."). By expressing no view on the propriety of the district court's rulings on those issues, and instead affirming the district court on the ICCTA issue alone, only the ICCTA issue has continued viability. The extraordinary remedy of vacatur is therefore unnecessary in this case.